(October 11, 1916.)

F. A. BLACKWELL, Appellant, v. R. F. KERCHEVAL, Public Administrator, Administrator of the Estate of WILSON KISTLER, Deceased, Respondent.

[160 Pac. 741.]

PRINCIPAL AND AGENT—UNAUTHORIZED ACTS OF AGENT—WHEN RATIFICATION INEFFECTUAL—CONSTRUCTION OF DOCUMENTS QUESTION FOR COURT—NONSUIT.

   1.   The general rule is that a ratification of the unauthorized acts of an agent, in order to be effectual and binding on the principal, must have been made with a full knowledge of all the material facts, and that ignorance, mistake or misapprehension of any of the essential circumstances relating to the particular transaction alleged to have been ratified will absolve the principal from all liability by reason of any supposed adoption of or assent to the previously unauthorized acts of an agent.

   2.   A principal does not ratify the unauthorized acts of his agent by accepting the proceeds or fruits thereof if knowledge of it did not come to him in time to enable him to repudiate the entire trans-

Upon the question of effect of payment by principal of what he deems property or service worth as ratification of agent's unauthorized contract for same, see note in 29 L. R. A., N. S., 400.

action without essential injury, or where all parties to the transaction cannot be placed *in statu quo.*

3. Where the evidence establishes that the unauthorized act of the agent was at the time a personal transaction of the agent made with a third party and was not intended by the third party or the agent to be made on behalf of the principal thereafter sought to be charged, there can be neither an express ratification nor an implied ratification by a retention of the benefits.

4. The question whether certain letters disclose the ratification of a previously unauthorized act of an agent, by which he seeks reimbursement from his principal, in the absence of ambiguity or a tendency to establish ratification, is primarily for the court to determine and not for the jury.

5. Where the plaintiff fails to make out a case for a jury, it is the duty of the trial court to dismiss the action and sustain a motion for nonsuit.

[As to general rules respecting authority of agents, see note in 16 Am. St. 493.]

APPEAL from the District Court of the Eighth Judicial District for the County of Kootenai. Hon. John M. Flynn, Judge.

Action brought against defendant as administrator to recover loss occasioned by unauthorized acts of plaintiff as agent. Motion for nonsuit granted. *Affirmed.*

John P. Gray, for Appellant.

The lack of full knowledge does not protect a principal who deliberately chooses to act without such knowledge, or where he deliberately ratifies without full knowledge under circumstances which are sufficient to put a reasonable man upon inquiry. (31 Cyc. 1257; *Clark v. Hyatt,* 118 N. Y. 563, 23 N. E. 891; *Johnson v. Ogren,* 102 Minn. 8, 112 N. W. 894; Mechem on Agency, sec. 153; *Glor v. Kelly,* 63 N. Y. Supp. 339; *Kelley v. Newburyport & A. H. R. Co.,* 141 Mass. 496, 6 N. E. 745.)

The presumption of ratification will arise on slight facts when the act is plainly for the benefit of the principal. (1 Clark & Skyles on Law of Agency, sec. 137; *Carlson v. Stone-Ordean-Wells Co.,* 40 Mont. 434, 107 Pac. 419; *Winkle-*

black v. National Exchange Bank, 155 Mo. App. 1, 136 S. W. 712; *Fitzgerald & Mallory Construction Co. v. Fitzgerald,* 137 U. S. 98, 11 Sup. Ct. 36, 34 L. ed. 608.)

By not disaffirming the act of the agent within a reasonable time, the principal must be held to have ratified it. (*Union Gold M. Co. v. Rocky Mountain Natl. Bank,* 96 U. S. 640, 24 L. ed. 648; *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587, 23 L. ed. 328; *Clews v. Jamison,* 182 U. S. 461, 21 Sup. Ct. 845, 45 L. ed. 1183; *Marsh v. Whitmore,* 88 U. S. 178, 22 L. ed. 482; *Law v. Cross,* 66 U. S. 533, 17 L. ed. 185; *Indianapolis Rolling Mill Co. v. St. Louis, F. S. & W. R. R. Co.,* 120 U. S. 256, 7 Sup. Ct. 542, 30 L. ed. 639; *Alaska & Chicago Commercial Co. v. Solner,* 123 Fed. 855, 59 C. C. A. 662.)

The mere fact that Blackwell was a stockholder and officer of the Blackwell Lumber Co. and glad to see some of the treasury stock sold would not affect the character of the obligation from Kistler to him, or his character as Kistler's agent in the transaction. (*Fitzgerald & Mallory Const. Co. v. Fitzgerald, supra.*)

The correspondence in this case bears directly upon the matter in suit and tends largely to show what the real relations between Blackwell and Kistler were. All of it was competent testimony in the case, and the weight to be given each letter was a matter for the jury and not the court. (*Rankin v. Fidelity Trust & Savings Deposit Co.,* 189 U. S. 242, 23 Sup. Ct. 553, 47 L. ed. 792; *Young v. Stephens,* 66 Mo. App. 222; *Carp v. Queen Ins. Co.,* 104 Mo. App. 502, 79 S. W. 757; *Riordan v. Doty,* 56 S. C. 111, 34 S. E. 68; *Smith v. Covenant etc. Benefit Assn.,* 16 Tex. Civ. 593, 43 S. W. 819; 19 Cent. Dig. 618; *Tritthart v. Tritthart,* 24 Ida. 186, 133 Pac. 121.)

The principal may not take the benefits and reject the burdens, but he must either accept them or reject them as a whole. (*Haney School Furniture Co. v. Hightower Baptist Inst.,* 113 Ga. 289, 38 S. E. 761.)

An agent ordinarily is entitled to indemnity against the consequences of all principal acts done by him in the execu-

tion of his agency or in pursuance of the authority conferred upon him. (Corpus Juris on Agency, sec. 458.)

C. H. Potts, R. J. Danson and James A. Williams, for Respondent.

The construction of documents or writings in evidence is a question of law and to be determined by the court. (*Bragg v. Martenstein,* 25 Cal. App. 199, 143 Pac. 79; *Slater v. United States Health & Accident Ins. Co. of Saginaw,* 133 Mich. 347, 95 N. W. 89; *Foster v. Berg & Co.,* 104 Pa. St. 324; *Dobbs v. Campbell,* 66 Kan. 805, 72 Pac. 273; *Bliven v. New England Screw Co.,* 64 U. S. 420, 16 L. ed. 510; *Mellen v. United States Health & Accident Ins. Co.,* 85 Vt. 305, 82 Atl. 4; *Shubert v. Rosenberger,* 204 Fed. 934, 123 C. C. A. 256, 45 L. R. A., N. S., 1062; 38 Cyc. 1429, 1522; 9 Cyc. 591, 776, 777.)

Ratification takes place only when the act claimed to be ratified was performed by one who intended it, at the time of performance, as the act of another and not the personal act of himself. (*Linn v. Alameda Min. & Mill. Co.,* 17 Ida. 45, 104 Pac. 668; 31 Cyc. 1251; *Ellison v. Jackson Water Co.,* 12 Cal. 542; *In re Roanoke Furnace Co.,* 166 Fed. 944; *Mattock v. Young,* 66 Me. 459.)

A ratification cannot take place without full knowledge of all the material facts. (31 Cyc. 1253; 1 Clark & Skyles on Agency, 106; *Findlay v. Hildenbrand,* 17 Ida. 403, 105 Pac. 790, 29 L. R. A., N. S., 400; *Bank of Owensboro v. Western Bank,* 13 Bush (Ky.), 526, 26 Am. Rep. 211.)

The mere fact that the principal has received or enjoyed the benefits of the unauthorized act will not amount to a ratification if he did so in ignorance of the facts; nor will his retention of such benefits after knowledge of the facts amount to a ratification if at the time he acquires such knowledge and without his fault conditions are such that he cannot be placed *in statu quo.* (31 Cyc. 1267–1270; *Humphrey v. Havens,* 12 Minn. 298; *Moyle v. Congregational Soc.,* 16 Utah, 69, 50 Pac. 806; *Mills v. Berla* (Tex.), 23 S. W. 910; *Swayne v. Union Mut. Life Ins. Co.* (Tex.), 49 S. W. 518; *Martin v. Hickman,*

64 Ark. 217, 41 S. W. 852; *Bryant v. Moore,* 26 Me. 84, 45
Am. Dec. 96; *Claflin v. Wilson,* 51 Iowa, 15, 50 N. W. 578.)

BUDGE, J.—This is an action brought by the appellant
against R. F. Kercheval, public administrator, and as such
administrator of the estate of Wilson Kistler, deceased, to re-
cover the sum of $29,548, together with interest on $24,480
thereof since the first day of November, 1913. This appeal is
from a judgment of dismissal entered upon a motion for non-
suit. The only error assigned and complained of is that "The
court erred in granting the motion for a nonsuit and in enter-
ing judgment thereon."

The main facts in this case, briefly stated, are as follows:

One Wilson Kistler, of Lock Haven, Pennsylvania, was a
stockholder in the Spokane and Inland Empire Railway Com-
pany, a corporation organized by the appellant herein and
one J. P. Graves of Spokane. In January, 1909, the appel-
lant sold his stock in the above-named corporation, and ad-
vised Kistler to dispose of his, but he decided not to sell.
During that year, Graves, who had purchased not only the
stock of the appellant but also other blocks of stock, sold his
holdings, which constituted the control of the Spokane and
Inland Empire Railway Company, to the Great Northern Rail-
way Company.

Kistler visited Idaho in May, 1909, and after looking over
the property of the Blackwell Lumber Company concluded
to and did purchase $25,000 worth of stock in said company,
and at the date of said purchase stated to one Schenker, pri-
vate secretary to Blackwell, the appellant herein, that he
hoped that Blackwell would be able to dispose of his (Kist-
ler's) stock in the Spokane and Inland Empire Railway Com-
pany; that he desired to turn that investment and take addi-
tional stock in the Blackwell Lumber Company. To this end
Kistler, by numerous letters, urged Blackwell to dispose of
his (Kistler's) stock in the Spokane and Inland Empire Rail-
way Company, that he might invest in stock of the Black-
well Lumber Company. After some correspondence between
Blackwell and Kistler relative to the disposal of the latter's

stock in the railway company and a transfer of the investment to the Blackwell Lumber Company, some time during the summer of 1909, one Davidson, secretary of the Inland company, advised Blackwell that he believed he could handle the Kistler stock through Graves, and thereupon gave Blackwell a memorandum in writing by which he agreed to take the Kistler stock; whereupon Blackwell telegraphed to Kistler to send on his certificates of stock in the Inland company, properly indorsed. The stock was in due time forwarded to Blackwell, and turned over to Davidson, who gave his receipt therefor, in which he stated that he had received 510 shares of Inland stock and agreed to pay therefor $24,480. This transaction between Blackwell and Davidson was had on or about the fourteenth day of October, 1909. On October 15, 1909, Blackwell wrote Kistler, informing him that he had not received the money for the stock, but expected to within a few days; that the certificates had been turned in to Graves; and that when the money for the stock was received he would turn it over to the secretary and treasurer of the Blackwell Lumber Company and forward certificates of stock in that company. On October 26, 1909, Blackwell again wrote Kistler that he had not received the money from Graves, but was in hopes that he would within a few days. On the first day of November, 1909, Davidson not having the money, Blackwell insisted on having a note, payable to himself, which Davidson gave him on that date, for $24,480, payable sixty days after date; thereupon Blackwell indorsed the Davidson note as follows: "Pay Blackwell Lumber Company or order," and delivered the same to the Blackwell Lumber Company, by which company it was indorsed and cashed at the Old National Bank of Spokane, Washington, after being discounted. Thereafter the Blackwell Lumber Company, by Blackwell's directions, sent Kistler a certificate for 250 shares of the capital stock of the Blackwell Lumber Company of the par value of $100 per share. On the second day of November, 1909, Blackwell wrote a letter to Kistler, which we do not deem necessary to set out in *haec verba,* but of which we will set out only such portions as we think are important so far as this case is con-

cerned. Blackwell began this communication by informing
Kistler that he had had quite a time in getting rid of his
Inland stock, and among other things said: "I did this busi-
ness through Mr. Davidson, Secretary of the Inland Empire
System, and insisted, in view of the fact that he said the stock
would be taken up, before I wired you to send it on, that he
take up the stock regardless of whether he could dispose of
it or not. Yesterday Mr. Davidson gave me his note for
$24,480, the proceeds of the stock at 48 [meaning $48 per
share]."

"I have accepted this note and turned the same over to the
Blackwell Lumber Co. Mr. Davidson is worth the money and
I think will meet the note. That is a chance the Blackwell
Lumber Co. has taken, *or rather that I took, as I have in-
dorsed the note.*"

Thereafter in the course of his letter he asked Kistler to
send his check for $520 more, which, together with the $24,480,
would complete his purchase of $25,000 of the capital stock
of the Blackwell Lumber Company, and upon receipt of which,
Blackwell said: "I will turn that over to the Blackwell Lum-
ber Co., and this will close up the transaction."

On November 8, 1909, Kistler answered Blackwell's letter
of November 2, 1909, and among other things in the letter
stated that he inclosed a draft for $520 in accordance with
Blackwell's request, and further on in the letter said: "I
hardly expected that you would take the trouble in closing
up the matter and go as far as you did in reaching a conclu-
sion where a body might have supposed that there would have
been enough interest with the representatives of the Inland
Empire Railroad Co. to at least have made an effort to pro-
tect innocent stockholders. I would not expect that you
should take any chances in the closing of this matter, and if
in the future anything should turn up with this that would
cause you any inconvenience, if you will please let me know,
I will take the matter up and see that you are fully protected."

The note given by Davidson to Blackwell, for $24,480, and
discounted at the Old National Bank of Spokane, Washing-
ton, was not paid at maturity, but was renewed from time to

time, the interest thereon being paid by Davidson up until approximately the first day of September, 1910, at which time Davidson informed Blackwell that Graves, upon whom he relied to take up the stock, had failed to do so and offered to return the stock to Blackwell, at the same time informing Blackwell that he could not pay the interest any longer and he had no money to take up the note. Blackwell refused to settle the matter in this way, and Davidson thereupon, at Blackwell's request, gave him two notes in lieu of the original note of $24,480, one of which was for $12,480, and the other for $12,000. The note for $12,480 Blackwell paid, or, in other words, paid the Old National Bank that amount on the original note of $24,480, and held Davidson's note payable to himself for $12,480. The other note for $12,000 was also made payable to Blackwell and was indorsed and discounted by him at the Old National Bank, where it was at the time of the trial of this action.

On September 21, 1910, Blackwell wrote to Kistler about other business matters, and in his letter among other things he used the following language: "In connection with this I might add that I am likely to have to take back the Spokane & Inland stock which I thought I had sold for you, think it was 510 shares. . . . . Mr. Davidson, secretary of the company gave me a letter agreeing to take this stock off my hands. He expected to put it in the sale that J. P. Graves and himself made to the Hill interests. As the stock was not here to put in the first lot sent in to the Hill interests, it together with Mr. Grinnell's and a lot of other holdings, was made into a second statement. Davidson and Graves expected that Hill would take that also, but up to this writing he has never done so.

"Mr. Davidson gave me his three [two] months' note for the stock, which note has been twice renewed. Personally he is not worth the amount and now he wants me to take the stock back. I do not know how the matter will come out.

"*While I consider the stock perhaps a good buy at $48 per share,* I would very much prefer Blackwell Lumber Co. stock at par, besides that the Lumber Company needs the money."

To this particular part of Blackwell's letter, Kistler made no reply.

In 1911, approximately a year later, Blackwell addressed another letter to Kistler, in which he used the following language with reference to the Inland stock transaction: "In connection with this, I might also state that I have never yet gotten my money for the Inland stock which I took up for you and for which you received stock of the Blackwell Lumber Co. (paid for in cash by me), Mr. Graves having failed to come through with the purchase of same as anticipated. The common stock of the Inland Empire road is now quoted at about $15.00, so you see I am holding the sack in that transaction. *However, in that you are not to blame, and I am not complaining.* I merely state the fact to show that we are trying to act fair with all our friends."

Mr. Kistler died about the month of January, 1914, and some time thereafter R. F. Kercheval was appointed as the administrator of his estate.

It will be conceded in this case at the outset that when Blackwell sold the Kistler stock in the Inland Company and took a note in payment in lieu of cash, he thereby exceeded his authority and thereupon became liable to Kistler for the value of the stock. It is from this liability that Blackwell seeks to be relieved and reimbursed upon the theory that Kistler, subsequent to the sale of the stock, agreed, in effect, to assume the Davidson note, in his letter to Blackwell of date November 8, 1909, and by his failure to reply to Blackwell's letter of September 21, 1910, as well as by his subsequent acts and conduct, all of which acts and conduct counsel for respondent contend constituted a ratification of Blackwell's unauthorized act.

The trial court, after hearing all of the evidence offered by appellant, reached the conclusion that it failed to establish a ratification, and thereupon granted respondent's motion for a nonsuit. The correctness of the court's holding is the sole question presented for review by this appeal.

Ratification as used in the law of principal and agent may be defined as the acceptance and confirmation by one person

of an act or contract performed or entered into in his behalf by another who at the time assumed to act as his agent in doing the act or making the contract, without authority to do so (31 Cyc. 1245), or, as stated by numerous authorities, it is the acceptance by the principal of a previously unauthorized act or contract by one who assumed to act as his agent in doing the act or making the contract, without authority, and relates back to and takes effect from the making of such contract. The act done or contract made must be on behalf of the principal; otherwise it is not subject to ratification. It is also absolutely essential, in order to bind the principal and relieve the agent, that the former had full knowledge of all of the material facts relating to or in any manner connected with the unauthorized act.

The fact that the agent was not fully informed, or was honestly mistaken, as to what the actual facts really were, will not ordinarily change the rule.

Counsel for appellant first contend in their brief that Kistler by his express warranty in his letter of date November 8, 1909, ratified the unauthorized act of appellant in the sale of Kistler's stock, or, in other words, we might say that counsel insist that Kistler in his letter of the above date expressly and unqualifiedly promised and undertook to save Blackwell harmless when he was informed by Blackwell in his letter of November 2, 1909, that he had sold his Inland stock and taken a note therefor in lieu of cash. If Kistler's letter is subject to such a construction, when construed in the light of subsequent correspondence between Blackwell and Kistler, relating to the sale of the latter's Inland stock, counsel's contention would be eminently correct, but a careful examination of the entire record forces us to the conclusion that Kistler's letter of November 8, 1909, is not subject to the construction contended for by counsel for appellant. It is quite evident that Kistler at the time he wrote the letter of date November 8, 1909, was not in possession of all of the material facts connected with the sale of his Inland stock, and in this connection we do not wish to impute to Blackwell the intentional suppression of any of the material facts. In reaching a deci-

sion in this case it may be conceded that Blackwell was unaware of some of the material facts when he wrote Kistler on the second day of November, 1909, informing him that he had been successful in disposing of his stock to Davidson; and that he had taken Davidson's note in payment for the stock in lieu of cash; and when he further stated that "Davidson is worth the money and I think will meet the note. That is a chance the Blackwell Lumber Co. has taken, or rather that I took, as I have indorsed the note," when in truth and in fact Davidson was not worth the money and consequently was unable to and did not meet the note at maturity.

It would be inconsistent to presume that had Kistler known the foregoing facts he would have written Blackwell on November 8, 1909, as follows: "I would not expect that you should take any chances in the closing of this matter, and if in the future anything should turn up with this that would cause you any inconvenience, if you will please let me know, I will take the matter up and see that you are fully protected." The above statement by Kistler in his letter was based solely upon what was contained in Blackwell's letter of November 2, 1909.

Had Blackwell told Kistler in his letter of November 2, 1909, that he had sold the stock to Davidson personally; that without authority he had accepted Davidson's note for the purchase price in lieu of cash; that Davidson was not financially responsible; that Graves had not legally bound himself to pay for the stock; and that whatever chance there was to be taken in the transaction Kistler would be required to take; and then had Kistler, being in possession of all of the material facts, written to Blackwell and said, "If in the future anything should turn up with this that would cause you any inconvenience, if you will please let me know I will take the matter up and see that you are fully protected," there is no question but that he would be bound.

When we consider the information that was given to Kistler and the facts as they really were which were unknown to him, we find no difficulty in applying the correct rule of law to the facts in this case, which is that before the principal

can be held to have ratified the unauthorized act of his agent, all the material facts of the transaction must have been fully and correctly reported to him, and he must have had the opportunity to adopt or repudiate the act of the agent with a full knowledge of all of the facts of the transaction, and if the agent failed to correctly report all of the material facts, there can be no ratification, nor is it material that the agent acted in good faith; or that his misrepresentations of the facts were innocently made; or that he reported the facts as he understood them; or all the facts that were known to him at the time. The principal must have been fully and correctly informed of all of the material facts at the time of the ratification. He could not ratify that which he did not know. (31 Cyc. 1253–1256.)

The rule is well stated in Clark & Skyles on Agency, vol. 1, p. 268, ''That the ratification of an act of an agent previously unauthorized must, in order to bind the principal, be with a full knowledge of all of the material facts. If the material facts be either suppressed or unknown, the ratification is treated as invalid, because founded in mistake or fraud. The general rule is perfectly well settled that a ratification of the unauthorized acts of an agent, in order to be effectual and binding on the principal, must have been made with a full knowledge of all the material facts, and that ignorance, mistake or misapprehension of any of the essential circumstances relating to the particular transaction alleged to have been ratified will absolve the principal from all liability by reason of any supposed adoption of or assent to the previously unauthorized act of an agent.'' (*Findlay v. Hildenbrand,* 17 Ida. 403, 105 Pac. 790, 29 L. R. A., N. S., 400; *Bank of Owensboro v. Western Bank,* 13 Bush (Ky.), 526, 26 Am. Rep. 211.)

It is next contended by counsel for appellant that Kistler, with full notice and knowledge that the agent had accepted the note from Davidson, and had indorsed and discounted it, accepted the benefits of the negotiation and sale of the Davidson note, and received and held the stock of the Blackwell Lumber Company which was purchased as the result of that negotiation; that these facts were communicated to Kistler in

Blackwell's letter of September 21, 1910, in which, in reference to the Inland stock, Blackwell said:

"I am likely to have to take back the Spokane and Inland stock which I thought I had sold for you, think it was 510 shares. And the story in connection with this is quite a long one. Mr. Davidson, secretary of the company, gave me a letter agreeing to take this stock off my hands. He expected to put it in the sale that J. P. Graves and himself made to the Hill interests. As the stock was not here to put in the first lot sent in to the Hill interests, it together with Mr. Grinnell's and a lot of other holdings, was made into a second statement. Davidson and Graves expected that Hill would take that also, but up to this writing he has never done so.

"Mr. Davidson gave me his three [two] months' note for the stock, which note has been twice renewed. Personally he is not worth the amount, and now he wants me to take the stock back. I do not know how the matter will come out.

"While I consider the stock perhaps a good buy at $48 per share, I would very much prefer Blackwell Lumber Co. stock at par, besides that the Lumber Company needs the money."

As above stated, counsel insist that the letter above quoted constitutes a ratification of Blackwell's unauthorized act in selling the Kistler stock and taking a note therefor in lieu of cash, and that it was the duty of Kistler in order to relieve himself from such ratification to have immediately upon receipt of the above letter, which counsel insist informed him of all of the material facts, to have at once written Blackwell and stated to him in substance: "Now that I find out that Davidson is not worth the money, I do not ratify your first contract and do not agree to hold you harmless." In other words, it was the duty of Kistler either to repudiate promptly the acts of Blackwell, or he must be held to have ratified such acts by remaining silent.

This last letter, it will be remembered, was written a considerable time after Blackwell's letter of November 2, 1909, in which he told Kistler that he had accepted the Davidson note and turned it over to the Blackwell Lumber Company; that Davidson was worth the money; that he thought he would

meet the note; and that if he failed to meet the note that was a chance the Blackwell Lumber Company had taken or rather that he took; and after Kistler sent on the $520 as requested by Blackwell, in order to make up his last subscription of $25,000 to the Blackwell Lumber Company's stock, and after the stock in the Blackwell Lumber Company had been issued to Kistler, which latter act made it impossible to place the parties *in statu quo.* This being true, ratification became impossible.

This letter was followed by Blackwell's letter of July 17, 1911, in which he wrote to Kistler, among other things, that Graves had failed to come through with the purchase of the Inland stock as anticipated and that common stock of the Inland company was quoted at $15.00, "So you see I am holding the sack in that transaction. However, in that you are not to blame and I am not complaining."

It is necessary to construe the correspondence as a whole in order to determine its meaning and the intention of the parties.

As a matter of fact, we think that a fair construction of the letter above set out, and others in the record, does not in any way indicate that Blackwell intended to hold Kistler personally responsible for the failure of Davidson to meet his obligation. The letters when considered in connection with other correspondence between Blackwell and Kistler, with regard to this stock transaction, bear out but one construction, and that is that when Blackwell sold the Inland stock to Davidson he was acting for himself and not for Kistler, and that he was willing at that time to assume the risk, if any, incident to such transaction.

As early as July 30, 1909, Kistler wrote to Blackwell, and among other things he said: "I hope that my stock of the Spokane Inland Railroad can be soon turned, as I wish to place the same with the Blackwell Lumber Co." On the eleventh day of August, 1909, Blackwell wrote to Kistler and in his letter will be found the following: "If you can see your way clear to take some more Blackwell Lumber Co. stock [meaning in addition to the $25,000 he then already had],

will be pleased to have you do so, and in the meantime will do my best to dispose of your Inland Common holdings.'' In reply to the last letter, on August 16, 1909, Kistler wrote to Blackwell with reference to the matter of purchasing Blackwell Lumber Company stock and said: ''At this season of the year we are receiving our bark supply which takes considerable money, and it does not exactly suit me just at this time to take any additional stock in the Blackwell Lumber Co. Hope you will succeed in changing my investment in the Inland Empire Railroad Co., as I always had calculated to make a turn on that investment and take stock in the Blackwell Lumber Co. for the same.'' On October 15, 1909, Blackwell wrote Kistler, informing him that he had received his favor of October 9, 1909, inclosing Inland certificates of stock; that he had turned the same in to Graves, and presumed he would have the money for them within a few days, and when he received the money that he would turn it over to the secretary and treasurer of the Blackwell Lumber Company and forward the certificates of stock in that company, which, he further says, ''I believe is in accordance with our agreement.'' Then followed the transfer of the Inland stock to Davidson; the discounting of the note received by Blackwell from Davidson; the payment to the Blackwell Lumber Company of $24,480, and the remittance by Kistler of $520, to make up the $25,000, all of which supported the testimony of Schenker, secretary to Blackwell, to the effect that when Kistler was visiting Idaho and went over the Blackwell Lumber Company's operations, he told Schenker that if he could sell his Inland stock he would change his investment and take additional stock in the Blackwell Lumber Company.

It is therefore clear that it was Kistler's intention to sell his Inland stock, and to invest the proceeds received therefrom in Blackwell Lumber Company stock, and that Blackwell understood that Kistler would buy additional Blackwell Lumber Company stock provided he could sell his Inland stock and not otherwise, and Blackwell, in order that this deal might be consummated, in the interest of his company, was ready and willing to take a chance, which at that time he evi-

dently did not consider to be a very desperate one, on Davidson paying the note when it became due.

The proof in the record strongly supports the idea that Blackwell was reasonably satisfied that Graves, while he would not obligate himself to pay for the stock, would be able to dispose of it to the Hill interests. It is likewise apparent that Davidson was not in a position at the time to purchase the Inland stock and pay cash for the same, and the record shows that he so informed Blackwell at the date of the expiration of the original note, if not earlier. Blackwell and Davidson both, no doubt, honestly believed at the time of the Inland stock transaction that Graves would put the deal through for them, and it was understood, pending the final consummation of the deal, that Davidson would pay the interest on the original note, which he did.

Counsel for respondent are again reinforced in their position that the transaction was a personal one on behalf of Blackwell's company by that portion of the record which shows that when Davidson ceased to pay the interest on the original transaction, Blackwell did not write to Kistler and request him (Kistler) to pay the interest and renew the note, or take up the note, but he again went to Davidson and they agreed to divide up the original note into two notes, one of which Blackwell retained personally and the other he discounted at the Old National Bank, and continued to pay the interest as it accumulated and to renew the note of $12,000 at the Old National Bank from time to time, without calling upon Kistler, during his lifetime, to take up any part of this indebtedness, or to pay the interest thereon, or to return the stock of the Blackwell Lumber Company. This demand was not made until some time after Kistler's death. This being a personal transaction between Blackwell and Davidson, and intended as such, there could be neither express ratification nor implied ratification by retention of benefits.

The fact that the principal received or enjoyed benefits of the unauthorized acts of an agent will not amount to a ratification if he did so in ignorance of the facts, nor will his retention of such benefits after knowledge of the facts amount

to a ratification if at the time he acquired such knowledge, and without his fault, conditions are such that he cannot be placed *in statu quo,* or repudiate the entire transaction without loss.   (31 Cyc. 1267, 1269, 1270.)

Counsel for appellant in their reply brief strenuously contend that the court committed reversible error in taking upon himself the right to place a construction upon the letters introduced in evidence, under the facts in this case.   These letters were offered for the sole purpose of establishing a ratification of an unauthorized act of an agent, and it was clearly the duty of the court to construe them for the purpose of determining whether they showed or tended to show a ratification, and if, from the construction placed upon the letters and other facts and circumstances testified to and appearing upon the trial, there was a total failure of proof to establish a ratification, it was the imperative duty of the trial court to so hold.   Whether the court properly construed the letters is another question, but that he had a right to construe them there can be no doubt.   From an examination of the record in this case the right of the appellant to recover depends upon the construction of these letters.   It is true that the complaint alleges certain acts and conduct upon the part of Kistler, that, had they been proven upon the trial, we are strongly persuaded to believe would have been sufficient to render his estate liable.   When this case was before this court upon a former hearing (*Blackwell v. Kercheval,* 27 Ida. 537, 149 Pac. 1060) upon a general demurrer to the complaint, we held that the complaint was sufficient, but upon the trial appellant failed to prove the allegations of his complaint; consequently the trial court was forced to determine this case upon the testimony as finally submitted, and in doing so was clearly within his rights when he construed the correspondence, as well as all of the evidence submitted by the appellant, and we think that the conclusions reached by the trial court are correct.

From what has been said, it follows that the court did not err in dismissing appellant's action and granting respondent's motion for a nonsuit.   The judgment of the trial court must

be *affirmed*, and it is so ordered. Costs are awarded to respondent.

Sullivan, C. J., and Morgan, J., concur.