(October Term, 1939)

## SCHERCK v. NICHOLS ET AL.

(No. 2112; October 30, 1939; 95 Pac. (2d) 74)

6

For the plaintiff in error, there was a brief by *Hagens & Wehrli* of Casper, and oral argument by *Mr. Wehrli.*

8

For the defendant in error, Florence H. Sheean, there was a brief by *H. B. Durham* and *C. M. Crowell* of Casper, and oral argument by *Mr. Crowell*.

For the defendants in error, Nichols and Howlett, there was a brief by *Greenwood* and *More* of Cheyenne, and oral argument by *Mr. Greenwood.*

BLUME, Justice.

This is an action brought by plaintiff on April 27, 1938, to declare the water rights of the defendants null and void. From a judgment for the defendants the plaintiff has taken his appeal. One Bryan was one of the defendants. He defaulted. His land is other than that of the other defendants, and it is not necessary to make further reference to him. The parties will be referred to as in the case below, or by name.

The creek involved in this case is Lumis or Madison Creek, which flows northerly through the SE/4NE/4 of Sec. 12, T. 32, R. 81, owned by defendant Sheean, and the NE/4NE/4 of Sec. 12, same township and range, owned by defendants Nichols and Howlett, thence northerly into Section 1 of the same township and range, where part of the lands of the plaintiff are located, and whose lands accordingly are located below those of the defendants, and northwesterly thereof. The defendants Nichols and Howlett derive their title from one Nick Dickenson, who became the owner thereof on January 12, 1929, prior to the time of the initiation of the water rights directly to be mentioned, and who used the water here in controversy from 1929 to the time of his death in 1937. Their lands will hereinafter be referred to as the Dickenson land. The defendant Sheean derives her title to the SE/4NE/4 above mentioned through one Mike S. Ryan, who was the owner thereof from 1911 to 1933, the time of his

death. The plaintiff has been the owner of the land for which he seeks the water here in controversy since 1933. The water rights which are claimed to be void were initiated by applications filed on August 17, 1929, by one Hill, a brother-in-law of Mike S. Ryan, with the State Engineer. These applications sought to appropriate water sufficient to irrigate 30 acres of land on the NE/4NE/4 above mentioned, then owned by Dickenson, and water sufficient to irrigate 12 acres of land in the SE/4NE/4 above mentioned, then owned by Mike S. Ryan. The applications were approved and permits issued thereon. The source of the water sought to be appropriated comes directly from four different springs, tributaries of Lumis Creek, namely, House, Twin and Hill Springs, all located on the SE/4NE/4 aforesaid, and from Red Spring, located in Lot 3 of Sec. 7, T. 32, R. 80, directly east of the above NE/4 NE/4, then also owned by Mike S. Ryan, and now owned by the defendant Sheean. On November 22, 1929, subsequent to the filing of the applications above mentioned, Hill gave a quitclaim deed to Mike S. Ryan of all his interest in the lands of Ryan and also that of Dickenson, although what interest he had therein does not appear, and he at the same time quit-claimed all his interest to Ryan in and to the applications and permits above mentioned. On December 31, 1931, certificates of appropriation were issued to Mike S. Ryan, pursuant to the above mentioned permits, granting water rights with a priority of August 17, 1929. Plaintiff's predecessor in interest made an application to the State Engineer to appropriate water from Lumis or Madison Creek sufficient to irrigate 14 acres of land. This application was filed on September 3, 1929, and a certificate of appropriation was issued pursuant thereto on December 26, 1934, with a priority of September 3, 1929.

1. So far as appears from the record, Hill had no

interest in the land on which the springs, the source of the water mentioned in his applications, are located. It is, accordingly, contended by counsel for the plaintiff that Hill was a trespasser on these lands, and that a water right cannot be initiated or acquired by trespass. He cites a number of authorities, including Bassett v. Swenson, 51 Idaho 256, 5 P. (2d) 722, where it was said that "it is quite generally held that a water right initiated by trespass is void; that is to say, one who diverts water and puts it to a beneficial use by aid of a trespass, does not, pursuant to such trespass, acquire a water right. Any claim thus initiated is void." Broadly speaking, the principle is doubtless sound, for it would seem to be against public policy that a right may be acquired by the perpetration of a wrong. Still, it has its limitations. Thus it is held by some authorities that a prescriptive title may be initiated by trespass. Allen v. Magill, 96 Ore. 610, 189 Pac. 986; 1 Kinney on Irr., (2nd Ed.) Sec. 688. Limitations also exist in connection with the law relating to the power of eminent domain. And the interest of complaining parties must be considered. The authorities relied on, including Bassett v. Swenson, supra, deal with situations in which an appropriator of water sought to initiate a water right on lands privately owned and against the protest of the owner. The statement, accordingly, contained in Bassett v. Swenson, supra, must be thus limited. A more correct statement is contained in Weil on Water Right (3rd Ed.) Sec. 221, in which it is stated that an initiation of a water right by trespass on another's land is void as against the owner of the land. The term "void" as here used, means no more than "voidable," for the owner of the land has the right to grant an easement in the land. It is stated in Kinney on Irrigation, supra, that "no rights to the use of the water can be acquired by a trespasser against the rights of the owner of the land." In the

case at bar we find no complaint on the part of the owner of the land on which the springs and ditch rights are located. In fact, the present owner thereof testified that the water is diverted with her consent. The plaintiff is not the one to object. In order that a man may interfere with or object to the acts of another, which may be voidable as to a third party, he must have some legal right or power to do so, and the person whose acts are sought to be hindered must owe to the former a correlative legal duty, using that term in the broad sense. We cannot conceive of any legal duty which was owing to the plaintiff by any one else to refrain from entering upon the land owned by Ryan. Plaintiff had no interest in the land. He had no legal right to interfere with a contract which might be entered into between the owner of the land and the appropriator of the water. He had no legal power to prevent such owner from granting an easement or a license or to make a gift of the right to use the land. The general principle here stated is illustrated in numerous instances in the law. See under "legal title" and "interested" in Corpus Juris. The appropriator had the right of eminent domain. 20 C. J. 575; Bassett v. Swenson, supra. It has been held that no objection to the exercise of that power can be raised by a third person not interested in the property. 20 C. J. 641. A license on the part of the owner dispenses with the necessity of condemnation, at least ordinarily. And even where no permission is granted, the right to object to the use on the part of the landowner may be lost by estoppel, laches or prescription. 20 C. J. 1179-1184. In fact, numerous decisions attest that this right to object is so personal to the owner of the land that his grantee or purchaser cannot sue for taking or injury occurring prior to his acquisition of title. 20 C. J. 1185.

2. As above stated, Hill, when he made the applications mentioned, did not own the land for which he

sought a water right, nor does it appear that he was in possession thereof or had any possessory right thereto. Furthermore, the certificates of appropriation were issued to Mike S. Ryan. He had no interest in the Dickenson land (NE/4NE/4). There may be sufficient reasons for these circuitous actions in the process of appropriating the water, but the record is completely silent thereon. Hill was a brother-in-law of Ryan. That may explain his action on behalf of Ryan. But he was not related to Dickenson, and no relationship of Ryan and Dickenson appears in the record. A mistake in this respect, however, seems to be out of the question, not alone because the application and the certificates of appropriation specifically mention the Dickenson land, but also in view of the fact that even Hill testified that Dickenson used the water commencing with the year 1929 to the time of his death, and most of it on his own land. It may be mentioned in that connection that no dispute exists as between the owners of the Dickenson land and Florence Sheean, owner of the Ryan land.

Counsel for plaintiff contend that these appropriations are invalid, because of the lack of interest of Hill in the lands, and that the appropriation for the Dickenson land is further invalid because of the lack of interest of Ryan therein. It seems that in New Mexico and Arizona, under a specific statute, no one can make an appropriation (or perhaps initiate it) unless he owns or possesses land. See 67 C. J. 894; In Re Determination of Relative Rights, etc., 45 Ariz. 156, 41 P. (2d) 228. That was true in Montana, under a statute of 1870, but is no longer true. Bailey v. Tintinger, 45 Mont. 154, 122 Pac. 575; see Miles v. Electric & Power Co., 32 Mont. 56, 79 Pac. 549; Tucker v. Jones, 8 Mont. 225, 19 Pac. 571. However, we are cited to Avery v. Johnson, 57 Wash. 532, 109 Pac. 1028, in which no such statute was involved and in which the court, in holding

that a squatter on unopened public land had not made a valid appropriation, stated that "if a party seeks to claim water for irrigating agricultural land by appropriation, he must own the land or be an actual bona fide settler having a possessory interest. * * * There must be an intent to acquire title. * * *" The statement on its face, without considering the context in which it was used, supports counsel's theory. The contrary has been held in cases also not involving a statute such as above mentioned, namely in Seaward v. Pacific Livestock Company, 49 Or. 157, 88 Pac. 963, and Smith v. Logan, 18 Nev. 149, 1 Pac. 678. These cases, however, are of doubtful, if any, authority herein, for the reason that they seem to be based on the theory that the trespasser, after losing the land for which he made the appropriation, has the right to use the water upon some other land. This seems contrary to the provisions of section 122-401, Rev. St. 1931 of this state, which provides that a right to unstored water for irrigation shall attach to the land, and "cannot be detached from the lands * * * for which they are acquired without loss of priority." Nevertheless, we do not think that Avery v. Johnson, supra, is a precedent herein. Washington recognizes riparian rights as well as rights obtained by prior appropriation. If, under such law, a squatter and trespasser can obtain a water right by prior appropriation, it would logically follow that he can obtain a riparian right by merely occupying the land, and the cases generally hold that this cannot be done. Kinney, supra, Sec. 523. In this state riparian rights are not recognized. Hence one of the reasons, and probably the main one, underlying the decision in Avery v. Johnson fails in this case, although we may add in passing that the decision in this case would not prevent us from arriving at the same conclusion as the Washington court in Avery v. Johnson, under similar facts, for we think that the facts in that case are not sufficiently

analogous to the facts in the case at bar so as to serve as a sufficient basis for a decision in this case. The differences are too great. The only resemblance is the fact that in both instances the man who initiated the appropriation was neither the owner nor in possession of the land for which the appropriation was sought to be made. In the Washington case the man was a trespasser. No trespass appears in the case at bar. The appropriation was sought for land rightfully in possession of and owned by another. Hill, and partly Ryan, seem to have acted in the nature of volunteers. These differences here pointed out are not, we think, unimportant, and while not necessarily leading to a different conclusion, they call for an individualization of premises in our reasoning. The real question in this case would seem to be whether it is against public policy (including under the statutes of this state) that some of the steps leading up to the ultimate act of appropriation are taken by some other than the person who puts the water to beneficial use without specific authorization on the part of the latter.

Section 122-404, Rev. St. 1931, provides that "any person, association or corporation hereafter intending to acquire the right to the beneficial use of the public water of the state of Wyoming shall * * * make an application to the state engineer for a permit to make such appropriation." This statute bears the interpretation contended for, namely, that the application shall be for the benefit of the applicant, but we think that is not the necessary interpretation. An attempted appropriation under a statute very similar (Sec. 1288x6, Compiled Laws of Utah 1907) was under consideration in the case of Sowards v. Meagher, 37 Utah 212, 108 Pac. 1112. In that case Meagher and associate filed an application with the state engineer to appropriate water for lands embraced in an Indian reservation, which was hoped or expected to be opened for settle-

ment. The direct question decided by the court was stated as follows:

"May an application be made to appropriate water for a beneficial purpose so contemplated in the future? We confess that the question is open to debate and is not free from doubt. We have, however, with some hesitancy reached the conclusion that such an application may properly be made in good faith and with an actual bona fide intention and a present design to appropriate the water for a beneficial use, though contemplated in the future, and when it is not made for the purpose of mere speculation or monopoly."

The court considered the point that the applicant might never be able to apply the water to his own lands, quoted at length from an Oregon case (hereafter mentioned) which held that the intention of an appropriator "may comprehend a use to be made by or through another person," and further stated that the applicant takes the risk that the lands may fall into the hands of another who might or might not be willing to take the water sought to be appropriated by the applicant. The court remarked further:

"In other words, if the proposed appropriator is not able to complete and finally establish his appropriations by applying the water and using it for, the beneficial purposes for which it was proposed to be appropriated, either by himself *or through the agency of some user,* his appropriation fails." (Italics are ours.)

It is evident that the court saw no objection to the use of water by a stranger to the applicant of a permit.

At least three decisions in Oregon hold that a ditch company may initiate an appropriation for the future use of another. In Re Water Rights, 134 Or. 623, 286 Pac. 563, 574; In Re Water Rights Hood River, 114 Or. 112, 137, 138, 227 Pac. 1065, 1073; Nevada Ditch Company v. Bennett, 30 Or. 59, 45 Pac. 472, 60 Am. St. Rep. 777. While, as already stated, it is the law in that state that the place of use of the water may be

changed, and that is true at best only to a limited extent, if at all, in this state, nevertheless part of the theory of the rule is, as well stated in Nevada Ditch Company v. Bennett, supra, that the owner of land, or one in possession thereof, may not have the capital with which to construct the irrigation works, and that others who are willing and able to do so should not be prevented from doing so in order to put the waters of the state to a beneficial use. The court accordingly concluded that "no sufficient reason has been suggested why the contemplated use may not be for and upon the possession of another." Other authorities along the same line are cited in 67 C. J. 984-5. While most of the waters of this state available by direct flow have probably been already appropriated, that may not be entirely so. If not, the theory of the case just stated would be directly applicable here, and we should hesitate for that reason alone to hold with appellant.

Water may, in this state, be impounded in a reservoir by anyone who is neither the owner or in possession of any land. That fact seems to have some bearing herein. The owner of such reservoir may sell, lease, transfer, and use such water in such manner and upon such lands as the owner may desire. Section 122-1602, Rev. St. 1931. In other words, one man may divert and impound water, under an application to, and permit by, the state engineer, for the ultimate use of it by another. The only material difference between such case and diversion by direct flow from a stream seems to be that in the former case the water is not required to be attached to land, while in the latter case it is. If, then, it is not contrary to the policy of this state that a man may apply for the diversion of water for the ultimate use of it by another as above mentioned, it would seem that that would be true also when water is diverted to be used upon land by direct flow from a stream, unless some special reason to the contrary

exists in the latter case. Counsel for plaintiff seem to think that they have found some special reason in the fact that no one should be able to acquire a monopoly of water, thinking, perhaps, that it is not so easy to do so when water is impounded in reservoirs, in view of the fact that the construction thereof ordinarily costs a great amount of money. It is true that it is the policy in this state, along with that of all the arid regions, that its waters should be put to the highest possible use. McHale v. Goshen Ditch Co., 49 Wyo. 100, 52 P. (2d) 678. And as stated in Toohey v. Campbell, 24 Mont. 13, 69 Pac. 396, cited by counsel for plaintiff, no one should be able to get control of any part of it for mere future speculative profit or advantage. It would seem, however, that this is hardly possible under the extensively regulative laws of this state, if the State Engineer and the Board of Control do their duty, and we presume that they do. For example, the application for a permit must be accompanied by a map which shows the land to be irrigated. Sec. 122-411, Rev. St. 1931. The State Engineer fixes the time within which the appropriation must be completed and in default of compliance, provisions are made for the forfeiture of the water right involved. Sec. 122-409. The final certificate of appropriation issued by the Board of Control must contain the description of the land to be irrigated. Sec. 122-418. And the water right becomes attached to the land as already stated. These and other provisions seem to amply safeguard the public interests.

It is correct, as argued by counsel for plaintiff, that the authorities hold that in order for an appropriation to become effective, an intention must exist at the time when the initial steps are taken to apply the water to a beneficial use either immediately or in the near future. 67 C. J. 884. A man cannot apply for water, or divert it, for idle purposes. He must claim it, if he wants to separate it from the unappropriated body of water.

But the claim need not, we think, be personal in the sense that no one else can reap the benefit thereof. That was virtually held in Rutherford v. Lucerne Canal Company, 12 Wyo. 299, 313. In that case one Pratt made the application and received the permit. The Lucerne Canal and Power Company, which he and others organized, adopted it, proceeded under it, though it was not assigned to it, and diverted the water pursuant thereto. The court held that a third party could not take advantage of the fact that Pratt did not personally fulfill the requirements of the permit. A ditch company in Colorado which diverts water is treated as an intermediate agent for the ultimate user of the water. Reservoir Company v. Southworth, 13 Colo. 130, 21 Pac. 1028; Wyatt v. Irrigation Co., 18 Colo. 308, 33 Pac. 144. See also Eldredge v. Mill Ditch Co., 90 Or. 590, 596, 177 Pac. 939, 941; In Re Water Rights, 115 Or. 27, 237 Pac. 322, 347. The water user, in such case, receives the benefit of the intent of the ditch company. After all, as stated in Nevada Ditch Co. v. Bennett, supra, that no matter who may initiate the right, if it is perfected the general purpose of an appropriation is accomplished. In Sowards v. Meagher, supra, the court stated that the "final step, and the most essential element, to constitute a completed valid appropriation of water is the application of it to a beneficial purpose." Our statute seems to lay the main stress on the beneficial use, and in the case of irrigation by direct flow from the stream, on the place of use. Other elements seem to be of more or less secondary importance, except, of course, that the prior applicant and permittee, who is diligent otherwise, has the prior right. No good reason, accordingly, appears, if the law is complied with in other respects, why a man should be forbidden to act as volunteer for another in connection with the steps leading up to a perfected appropriation. If Hill wanted to act as a benefactor of Ryan and

Dickenson, and Ryan wanted to act as a benefactor of Dickenson, sound policy does not, we think, require that this should be forbidden merely to give another who has no greater right to the unappropriated waters of this state, and who has been tardy, the chance to obtain it. That one may accept the benefit of the services of a volunteer is not unknown either to ancient (Mechem, Agency, 2nd ed., page 8; Story, Agency, 9th ed., Sec. 239) or to modern law. Thus a man may receive the benefit of a voluntary payment made to another for him. 67 C. J. 276; 48 C. J. 734-736. He may, under modern decisions, receive the benefit of a contract entered into by others, even though a contract is primarily personal to the parties thereto. Lawrence v. Fox, 20 N. Y. 268 (the leading case); 13 C. J. 705. He may ratify any lawful act of another on his behalf. 2 C. J. 474; 2 C. J. S. 1079. See further the cases dealing with absence of ratification, but retention of benefits—for example, Blackwell v. Kercheval, 29 Idaho 473, 160 Pac. 741.

3. We have stated that Hill, after he made the applications in question and received his permits, conveyed his rights to Ryan. Counsel for plaintiff contend that, by reason of this fact, the owners of the Dickenson land—the NE/4NE/—never acquired any water right. In the first place, it is contended that Hill by making such conveyance showed that he never at any time meant to act for and on behalf of Dickenson. We think, however, that the description of the NE/4NE/4 mentioned in each of the applications shows, prima facie at least, the intention to act on behalf of Dickenson, or at least the Dickenson land. Whether Hill could subsequently deprive the land of any initiated right therefor is another question. Counsel argue that under the decisions of this court, namely Frank v. Hicks, 4 Wyo. 502, 35 Pac. 475; McPhail v. Forney, 4 Wyo. 556, 35 Pac. 773, and Johnson v. Irrigating Co., 13 Wyo. 208, 79

Pac. 22, the water right is severable from the land; that Hill, accordingly, when he conveyed his interest in his applications and permit to Ryan definitely severed the right thereunder from the Dickenson land, and deprived it of whatever right was initiated therefor. But the rule above mentioned, stated in the foregoing cases, is no longer the law in this state. Section 122-401, Rev. St. 1931, first enacted in 1909 and modified by Chapter 161, S. L. 1921, adopted the policy that a water right by direct flow from a stream shall be attached to land. It may, perhaps, be argued that this section relates only to a perfected right. However, the land to be irrigated must be shown, commencing with the initiation of a right to the perfection thereof. The application of a permit, as already stated, must be accompanied by a map showing the land on which the water is to be used. Section 122-415 provides, in broad language, for the correction of any errors, provided that the correction must be made before final adjudication. That, we think, includes the correction of errors in the description of land. In fact, prior to the amendment of that section in 1929, it provided only for the correction of errors in the description of land, and the amendment, we think, merely broadened the scope of correction. It may be that if Hill never intended to initiate a water right for the Dickenson land, or if he, by the conveyance above mentioned, actually intended to deprive that land of any such right, other lands might have been substituted pursuant to the power of correction as above mentioned. But no such correction was made, or attempted to be made, and hence the adjudicated water right became, under the statute, attached to the land mentioned in the applications and permits.

4. It is contended that part of the water rights of the defendants has been abandoned. This is claimed upon the theory that only a comparatively small

amount of the acreage for which water was adjudicated has been irrigated. An abandonment of a water right, however, must be voluntary. It cannot be held to be abandoned, if non-user is caused by facts not under the appropriator's control. Ramsay v. Gottsche, 51 Wyo. 516, 69 P. (2d) 535; Morris v. Bean, 146 Fed. 423. The evidence in this case shows sufficiently, we think, that all the water which came down the stream was used, and that this was not enough. The instant contention must, accordingly, be overruled. It follows from what we have said that the judgment herein must be affirmed. It is so ordered.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.