[Civil No. 3481. Filed February 11, 1935.]

[41 Pac. (2d) 228.]

In the Matter of the Determination of the Relative Rights to the Use of the Waters of Pantano Creek, and Its Tributaries, in Pima County, Arizona. ALMA MONTHAN TATTERSFIELD, Appellant, v. CLEAVELAND PUTNAM, Appellee.

Mr. D. V. Mulhern and Mr. B. H. Gibbs, for Appellant.

Mr. John B. Wright and Mr. Ben C. Hill, for Appellee.

LOCKWOOD, C. J.—This is an appeal from a judgment of the superior court, rendered in a proceeding brought under the provisions of the State Water Code, to determine the relative rights of various claimants to the waters of Pantano Creek. The facts, as they appear from the findings of the trial court and as they may reasonably be inferred from the evidence so far as the latter establishes facts necessary to sustain the judgment, and which were not specifically found by the trial court, may be stated as follows:

In the year 1891, C. O. Crane and J. J. Fraker had either acquired or initiated the right to acquire from the United States by homestead entry, or otherwise, the following described lands situated in Pima county, Arizona: The W.½ N.E.¼ and S.E.¼ N.E.¼ of section 15 and W.½ N.W.¼, N.½ S.W.¼, S.W.¼

S.E.¼ of section 10 and E.½ N.E.¼ of section 9, and S.½ S.E.¼ of section 4, all in Tp. 16 S., R. 16 E., G. & S. R. B. & M. About the same time, Crane recorded in the office of the county recorder of Pima county a notice of appropriation of the waters of the Cienega Creek, being the same stream afterward referred to as Pantano Creek, sufficient to fill a ditch 3 feet wide at the bottom and 18 inches deep and to irrigate 320 acres of land, and stated that he intended to divert it at a point on Cienega Creek, either in sections 14 or 23 of the township above described, for the purpose of irrigating certain portions of his land above described in sections 10 and 15. For some reason, apparently, Crane and Fraker pooled their interests and applied water from Cienega Creek, through the ditch above described by Crane, to certain lands. At that time the boundaries of their lands had not been definitely marked on the surface, and Fraker inadvertently built his house some distance to the north of the northern boundary of the land to which he had initiated the right to acquire, or had acquired, title from the United States, and began to irrigate approximately 32 acres which he believed to be part of his homestead entry, but which, as a matter of fact, was open and unappropriated government land. Crane also irrigated certain portions of his land which we need not describe at the present time.

All of the land of Crane and Fraker, above described, finally passed through various mesne conveyances to the La Cienega Land & Cattle Company, a corporation, hereinafter called the company, in the year 1906. After the company acquired the property, it continued to irrigate and cultivate most of the land which it found under cultivation, including the 32 acres cultivated by Fraker on the public domain as aforesaid, which last we shall hereafter re-

fer to as the Tattersfield land, and began to irrigate a small portion of the S.E.¼ of the S.W.¼ of section 10, which we shall hereafter call the Monthan land, believing it also to be a part of the Crane-Fraker land.

In 1908 the corporation filed another notice of appropriation of the waters of the Cienega Creek, which it then called Pantano Creek, stating that it was for irrigation of the 480 acres included in the Crane-Fraker land, and proceeded to make extensive and valuable improvements in the irrigation system which conveyed the water to the lands.

In the winter of 1919 or the spring of 1920, and while the company was in possession of and using all of the lands above mentioned, including the Tattersfield and Monthan lands, one Santiago Leon took possession of the S.W.¼ N.E.¼ and N.W.¼ S.E.¼ of section 4 in said township, comprising 80 acres, in which the Tattersfield land was located, and one Casimiro Bravo moved upon the S.E.¼ S.W.¼ of section 10 in said township, and thereafter each respectively attempted to initiate title to the land so occupied by him as a grazing homestead under the federal land laws. It was then for the first time that the company discovered that the land located by Leon and Bravo, as aforesaid, and parts of which had been irrigated and cultivated by it for many years, was not included in the Crane-Fraker land, which it had bought in 1906. Thereupon Alma Monthan Tattersfield, who was at that time one of the principal stockholders in the company, filed a contest against the Leon entry, and Guy Monthan, who was also a stockholder, filed a similar contest against the Bravo entry, and, after the matter had been finally determined by the land office, it was held that when Leon and Bravo had made their entries, the land in question, although no attempt to acquire title thereto had been

made by the company, or any other person, was as a matter of fact "occupied" by the company and that it was therefore, under the land law of the United States, not subject to location by any person except the actual occupier thereof, and that Tattersfield and Monthan, although they had successfully contested the entries of Bravo and Leon, would be allowed to make entry of the land in question only if the company, the actual occupant, failed to take steps to acquire title thereto within a reasonable time. The company, being a corporation, of course, could not homestead the land, and apparently it was impracticable to acquire title thereto in any other manner, so by resolution of its board of directors it waived its prior right to acquire the land in favor of Tattersfield and Monthan, and the latter made homestead entries thereof and eventually obtained patents thereto from the United States. Immediately upon Leon and Bravo taking possession of the land, the company had cut off the irrigation water therefrom, and refused to allow any water to pass through its ditches, the only practicable method of irrigating the land; but after Tattersfield had made her homestead entries, she leased her land to the company and it again irrigated the 32 acres in question up to 1931.

In 1930 the company, being in financial difficulties, was placed in the hands of a receiver, and on October 13, 1931, the receiver, under proper orders of the superior court of Pima county, deeded to Cleaveland Putnam and Margaret Putnam, his wife, all the real estate of the corporation, which included the Crane-Fraker land, together with the water system which had been constructed by the company for the purpose of irrigating its lands. Immediately upon receiving this deed, Putnam refused to allow any of the water of Pantano Creek carried through the company's water system, above described, to be used to

irrigate the Tattersfield land. In the meantime, the homestead located by Monthan, after its entry by the latter, had been irrigated in the same manner as before, and had passed through various mesne conveyances to Putnam, but no effort was made at any time to initiate a new appropriation therefor under the Water Code of 1919 (Laws 1919, chap. 164), or the amendments thereto (Laws 1921, chap. 64, Laws 1927, chap. 109). Application was made in 1930 to the water commissioner, under the Water Code, for a determination of the respective rights of the Putnams and Tattersfield to the waters of Pantano Creek. Proceedings were had in the manner required by statute, and on the 14th of October, 1932, the water commissioner made findings of fact, granting to Tattersfield a right to the use of water for the irrigation of the 32 acres of land above referred to as of the year 1907, and to the Putnams certain rights to the use of water as of the year 1906, and to the state of Arizona certain rights as of the year 1908. Thereafter both Tattersfield and Putnam appealed to the superior court from the decision of the commissioner in the manner provided by the Water Code, and the case was heard before the court, which finally made findings of fact and conclusions of law, and by its judgment granted to Putnam a right to use the water for irrigation, stock, and domestic purposes on 128.842 acres, which included a certain area in the Monthan land which had passed to Putnam, as well as in the Crane-Fraker land, and denied to Tattersfield and the state of Arizona the right to the use of any water whatsoever. From such judgment of the superior court, this appeal has been taken.

There are some twenty assignments of error which are grouped by the appellant, Tattersfield, as required by our rules, under four propositions of law. These propositions may be stated as follows:

"I. Every right to the use of water for irrigation must be appurtenant to a particular piece of land and the ownership or diversion works and ditches does not entitle such owner to a 'floating' water right, for the beneficial use is the basis, measure and limit to the use of water.

"II. Land, the title to which is in the United States, but which is in the possession of or settled upon and improved or cultivated by anyone, is not vacant, unappropriated, public land, and the occupation and possession of such land is sufficient basis for the acquiring of a water right appurtenant thereto.

"III. Intention of the beneficial user is the predominating factor in determining whether water used for the irrigation of land in his possession becomes appurtenant thereto and abandonment of such a water right, unless forfeited by operation of law, is governed by the intention of the possessor of the land, either expressed or presumed from his actions.

"IV. The land of the one first applying water to beneficial use for irrigation has a right thereto prior in time to the right appurtenant to lands on which application to beneficial use is subsequently made and relative priorities of various water rights are the dates on which the water was put to beneficial use on the respective tracts. (That is, where the right to the use of water was not initiated under statutory provisions)."

We consider the first proposition of law. The nature of a water right has often been discussed and we find a great diversity of opinion in the various states which have adopted, in a greater or lesser degree, the doctrine of prior appropriation. This is probably due to the fact that this law was unknown to the early settlers of eastern America. When they came to this country, they brought with them the principle of law known as riparian rights, a system well suited to the eastern United States and indeed to most of Mississippi Valley. It was but natural, therefore, that when the more arid portions of the Union were first settled in the middle of the last cen-

tury by their descendants, the latter took with them the law to which they had been used, not recognizing that it was utterly inapplicable to changed climatic conditions. California and Oregon at first definitely adopted the law of riparian rights in its full extent and many vested rights arose thereunder. Naturally, when it was realized that this law must be modified or abolished, and the law of prior appropriation substituted therefor, in order to permit full development of their agricultural resources, they did not, and perhaps could not, understand fully the extent to which it was necessary to change their preconceived ideas, and endeavored rather to adapt the new law to the system and forms with which they were already familiar. Most of the other western states settled later, were inclined to follow the precedents established by these two states, and instead of accepting in full the principles tested by time in the countries which had used the law of prior appropriation for ages, attempted, through statutes and decisions which met specific conditions from time to time as they occurred, to recast the new ideas in the forms and principles of the old law. It was easy enough to recognize that there was no private property in the *corpus* of the water, for this was but a repetition of the rule prevailing under riparian rights, but when the right to the use of the water was under consideration, most of the states were hampered by the old principles and failed to adopt a definite, consistent, and logical theory of the law of appropriation, on which to base either their statutes or decisions. Some of the cases held that the right to the flow and the use of water for irrigation was real estate. *Hill* v. *Newman,* 5 Cal. 445, 63 Am. Dec. 140; *Travelers' Ins. Co.* v. *Childs,* 25 Colo. 360, 54 Pac. 1020; *Knowles* v. *New Sweden Irr. Dist.,* 16 Idaho 217, 101 Pac. 81; *Rickey Land & Cattle Co.* v. *Miller & Lux,* (C. C. A.) 152 Fed. 11; *Conant et al.* v. *Deep Creek & Curlew Val.*

*Irr. Co. et al.,* 23 Utah 627, 66 Pac. 188, 90 Am. St. Rep. 721. It was observed, however, that although it might perhaps be "real estate," it could not fall within the term "land." *Mt. Carmel Fruit Co.* v. *Webster,* 140 Cal. 183, 73 Pac. 826. It was sometimes called an easement (*Smith* v. *Denniff,* 24 Mont. 20, 60 Pac. 398, 81 Am. St. Rep. 408, 50 L. R. A. 737), although this was denied by some of the text-writers (Wiel Water Rights, 3d ed., par. 287), and it was quite generally held that it was independent, not only of the ditch or the canal which carried it, but of the ownership or possession of any land, and subject to disposal separately therefrom by the appropriator. The following definition sets forth in substance the view which prevailed, until recently at least, in most of the arid states:

"A water-right of appropriation is real estate, independent of the ditch for carrying the water, and independent of ownership or possession of any land and independent of place of use or mode of enjoyment, whereby the appropriator is granted by the government the exclusive use of the water anywhere so long as he applies it to any beneficial purpose, and it is an incorporeal hereditament, solely usufructuary, not conferring ownership in the *corpus* of the water or in the channel of the stream.

"This definition, being made by consolidating the elements already separately considered, is in each element supported by the authorities."

From this it followed that an appropriator of water for the purpose of irrigation need not necessarily be the owner of any land whatever, although it was, of course, necessary that the water must be used on some land, either his own or that of another. It further followed from this view that the application of the water could be changed from one piece of land to another at any time at the will of the owner of the right. Such a system, however, as irrigation grew in importance, began to produce injustice to

individuals, and to tend to hamper the general development of the arid regions. The two sister territories of Arizona and New Mexico, however, due perhaps to the fact that they had, when they first became a part of the Union, been familiar with the civil law doctrine of prior appropriation for many years, and that their settlement by those who were familiar with the riparian doctrine was postponed until after its weaknesses when applied to western conditions became fully apparent, had from the very first adopted that law, together with all the implications naturally flowing therefrom, and had utterly repudiated any connection with or reliance on the doctrine of riparian rights.

The first legislature of the territory of Arizona in 1864 had the wisdom to foresee the necessity of the situation and the only possible way of fully developing the resources of an arid state and, therefore, in its first session expressly denied the applicability of the doctrine of riparian rights to our conditions, and established the law of prior appropriation as it had existed for centuries in Mexico as best suited to our conditions. This statute has always been our fundamental water law, and we have never departed therefrom, later statutes and judicial decisions being but an amplification and development of the principles found in the Howell Code of 1864. *Maricopa County Municipal Water Conservation Dist. v. Southwest Cotton Co.*, 39 Ariz. 65, 4 Pac. (2d) 369. The statute, however, being general in its terms and a declaration of principles rather than a specification of the methods in which those principles should be carried out, necessarily left many details for elucidation at a future time. As agricultural development proceeded in Arizona and new settlers came in, many of them from states which had not fully appreciated and recognized the implications of the doctrine of prior appropriation, abuses and misapplications of

the true rule became prevalent. The usual method of bringing the water on the land, aside from the cases where some individual built a small ditch for his own use and took water from some of the smaller streams, was for a group of farmers to, in a more or less informal manner, agree that each should contribute a certain amount of labor for the building and maintenance of a water system, generally consisting of a canal from some adjoining stream and a temporary brush and rock dam for the diversion of enough water to supply the land owned and occupied by the farmers who built the canal. As new settlers came in and took up land not already under cultivation but susceptible of irrigation from an existing water system, they were permitted, by doing their share of the work, to secure a supply of water.

All went well for a time, but as more and more land came into cultivation, and as the necessity for larger ditches and more permanent dams became apparent, it was found that these voluntary associations no longer worked well, and they were generally replaced by corporations in which originally every farmer who secured water for his land from the canal held an amount of stock proportionate to the acreage which he owned, and the cost of maintaining the water system was paid by an annual assessment levied on the holders of the stock, and it was soon taken for granted that the real appropriator of water was the owner of such stock, and that the right to the use of the water followed its ownership.

Before long the amount of land for which water for irrigation from each of these canals was desired became greater than the water available in the rivers, and as the rule of "prior in time, prior in right" was accepted from the first, these later lands frequently could not be cultivated.

A large percentage of the crops raised at this time were annual in their nature, such as wheat, barley

and the like, and from time to time some of the owners of stock in the canals would for one reason or another determine to allow all or part of their land to lie fallow for a year or more. It seemed to them and to the others a pity that the water which it was believed they were entitled to use on account of the ownership of such stock should go to waste, and gradually the custom arose of renting such stock from year to year to other farmers who owned no stock in the canal, it being taken for granted at that time that it was the ownership of stock in the canal company and not the ownership of the land on which the water was used, which gave to the owner of the stock the right to demand that a proportionate amount of water should be applied to any land which he might from time to time designate. For a time this system worked in a reasonably satisfactory manner, but eventually various men who possessed surplus funds, but neither owned and farmed land themselves nor desired to do so, concluded that it would be a profitable investment for them to buy from more or less needy stockholders in the various canals their shares of stock, and the situation developed until in many of the canal companies of the state the ownership of the stock, and presumably the right to the use of the water, was in a group of men who had no interest whatever in the farming of land lying along the canal, except to obtain the highest possible rental for the use of their stock. Some, however, of our more far-seeing citizens and lawyers, and particularly the Honorable Joseph Kibbey, to whose vision and sound judgment the state of Arizona owes more than it can ever pay, had felt from the first that such a system was inconsistent with the fundamental principles of the law of prior appropriation and the public policy of our territory, and the matter was taken into the courts. In 1901 this court rendered its opinion in the famous case of *Slosser* v. *Salt River Valley*

*Canal Co.,* 7 Ariz. 376, 65 Pac. 332, 334, in which, after a full and exhaustive consideration of the general subject of irrigation and the statutes and decisions of all of the other arid states, we laid down certain principles which have ever since been followed, both by the courts and the legislatures of Arizona. They may best be set forth by a quotation therefrom:

" . . . An examination of the statutes of the various states and territories where the doctrine of prior appropriation is recognized and enforced will disclose that the legislation of this territory differs fundamentally, upon the subject of appropriations of water for beneficial uses, from the legislation of other states and territories, with the single exception of the territory of New Mexico. Arizona, prior to its organization as a territory, constituted a part of the territory of New Mexico, but originally, and before the annexation under the treaty of Guadalupe Hidalgo, and the subsequent purchase, under the Gadsden treaty, of that part of the territory lying south of the Gila River, constituted a part of the state of Sonora. The first legislation by the territory followed closely the old Spanish and Mexican laws upon the subject of water rights, as these had been incorporated in the statutes of New Mexico. Under these Mexican and Spanish laws, enforced in the state of Sonora, the holding of land was the basis for any valid appropriation or use of water from a public stream. . . . Whatever, therefore, may be the law as declared by the supreme court or court of appeals of Colorado, or the courts of last resort of other states and territories having a dissimilar history, or whose water laws have grown out of the local customs of miners, as in California and Nevada, these are not controlling and are not even authoritative in the decision of questions which arise, as in this instance, wholly and entirely under our own peculiar statutes. The various congressional acts pertaining to water and water rights, beginning with the act of July 26, 1866, have recognized the local laws, customs, and decisions of courts as controlling in the

matter of the acquisition, enjoyment, and disposition of rights to the use of water on the public lands, and hence do not need to be especially considered. . . .

"As we have seen, the statutes make the ownership and possession of lands essential to a valid appropriation of public water. A water right, therefore, to be available and effective, must be attached to the land, and become, in a sense, appurtenant thereto. It follows, therefore, so long as such water right is attached to a particular tract of land it cannot be made to do duty to other land. The law does not recognize that an individual appropriator of water, having a prior right to the use of the same, may, indiscriminately, by himself or others, make it apply, so as to retain its priority, to any land whatsoever. . . .

"In other words, a water right, to be effective, must be attached to and pertain to a particular tract of land, and is in no sense a 'floating' right. We do not wish to be understood as holding that a water right which is so attached becomes inseparable from such land. That is to say, we do not hold that a prior appropriator of water may not convey his prior appropriation to another, without the land, so as to confer upon his vendee of such water right all the rights which the vendor may possess, provided such vendee makes a beneficial use of such water right upon lands which he owns or possesses. But we desire to be understood simply as holding that, so long as a water right is attached to a particular piece of land, it cannot be made to do duty to such land, and as well to other land not owned or possessed by such water-right holder, at the will or option of the latter. In the briefs, as well as in the very able and elaborate argument made by counsel for appellee, the right of shareholders to do this, and the duty of the defendant company to recognize the right, have been strenuously argued. In this, however, we think counsel confuses the right of an appropriator to sell or transfer by conveyance his water rights to another with the assumed right in question. To recognize the right of a prior appropriator to lease his water right independent of his land would, as we conceive, be subversive of the underlying prin-

ciple of our water-right law. The right of alienation of a water right is one which is based upon the general right of property, and arises out of the necessity, in order that injustice may not be done to the owner, of permitting such alienation, for the reason that it frequently happens, through no fault of the owner, and by the operation of natural laws, that land to which water rights have been attached becomes unsuitable for cultivation. Floods frequently wash away and destroy farming lands, or leave deposits of coarse gravel and boulders upon them; and other natural causes frequently render such lands not only unprofitable, but impossible of irrigation and cultivation. Natural justice, therefore, is subserved by recognizing the right of a water-right holder to change his appropriation, under such circumstances, to lands capable of profitable cultivation, or to sell his right to another, to be used by the latter for a beneficial use recognized by the statute. . . . ''

It will be seen from this quotation that it was held positively and distinctly that the right to the use of water for irrigation must be appurtenant to a particular piece of land and that such right could not in any manner be transferred to any land for which it was not originally appropriated by the owner or possessor thereof, with the sole exception that if, through no fault of the owner of the land, and by the operation of natural laws, the land became unsuitable for cultivation, there might be a permanent alienation of such right from the land whose real value had thus been, by natural causes, destroyed, to some other piece of land, and that when so transferred subsequent transfers could only be made under like conditions. This principle has, ever since the decision of the Slosser case, been assumed by our courts to be the law of Arizona, and has been tacitly recognized by the legislature ever since that time, by its failure to enact any laws inconsistent therewith. It was expressly recognized in 1919, when our first complete Water Code was adopted, by the provisions

of section 48, chapter 164, Session Laws 1919, later carried forward in substance into the Code of 1928 (section 3314).

██ We hold, therefore, that in order to appropriate the right to use water for irrigation the appropriator must be the owner or possessor of land which is susceptible of irrigation, and that the appropriation once made attaches permanently to such land and none other, and cannot be transferred therefrom, except when through natural causes and no fault of the owner it becomes impracticable to use the water economically or beneficially on the land to which it is appurtenant.

██ We consider next the second proposition of law. As was stated in the Slosser case, the appropriator of water must be the owner or possessor of the land for which the appropriation is made. The meaning of "ownership" is so definite that we need not discuss it, but when it comes to the question of what is meant by a "possessor," the matter is more difficult. A person may possess land in two manners, either with the present intent and apparent future ability to acquire the ownership thereof, or else temporarily, through lease or mere occupancy, when he lacks either the intention or the ability to acquire the full title for himself. We know of no case from a state where a water right must necessarily be appurtenant to one particular piece of land, as it must be under our law, which holds that an appropriation may be made by the temporary possessor of land as defined above. Even in the states which do not hold that the right to the use of water for irrigation must be appurtenant to a particular tract of land, wherever an appropriation of water for use on land which is merely "possessed" or "occupied" has been upheld, it will be found that the possessor was in possession with the intention of and present ability to acquire the ownership of the land, generally from

the federal government, and that his possession was protected either by the state or the federal government, or both, on the ground that he did so intend eventually to acquire ownership. In such cases it is generally held that an appropriation of water may be initiated, and that when the right of possession of the land passes, if nothing is said in the conveyance of the land in regard to the water right, it passes also as a matter of law, but that the right once it has been properly initiated, may be sold separately. If such be the limitation of the right of a "possessor" of land to initiate an appropriation of the right to the use of water even in the states where it can be transferred separately from the land, much more does that limitation apply in jurisdictions where the water must be appurtenant to the land. It would be contrary to the spirit, as well as the letter of our law, to hold that it is possible for a temporary occupant of lands, who has no intention or ability of acquiring a permanent title thereto, to make a valid appropriation of a water right which must be necessarily appurtenant to that land.

 So far as the third proposition of law is concerned, there must, of course, in order to make a valid appropriation of water, always be an intent on the part of the alleged appropriator to make it, and even though he be the holder of a fee-simple title to the land, and though he use appropriable water upon such land for the purpose of irrigation, if it is not done with the intention of making an appropriation, of course, none exists. The state does not attempt to force upon an unwilling victim a valuable property right which he does not desire and has no intention of acquiring.

 The fourth proposition of law is simply a repetition of the fundamental principle of the law of appropriation "prior in point of time, prior in right," except that it should be amplified by the addi-

tion that, except where the doctrine of relation is applicable, the date of an appropriation is the time at which the actual beneficial use of the water commenced.

Let us apply the principles of law above stated to the facts of the case. At the time water was first applied to the Tattersfield and Monthan lands, it was with the belief on the part of Crane and Fraker that such lands were embraced in the real estate which we have called the Crane-Fraker land, and it is unreasonable to suppose that either of them had any intent of making an appropriation for government land to which they never made any attempt to acquire title. Further than that, even had they intended to make an appropriation for the land which was actually irrigated, it could only have been made at a time when they had not only the intention but the necessary legal qualifications to acquire the title to the land, and the record negatives the idea that either such ability or intention existed. The true facts undoubtedly are, as the trial court must presumably have found, that the beneficial application of water to the Tattersfield and Monthan land was made under the mistaken belief that it was land to which Crane or Fraker, and their successors in interest, had acquired a title. Such being the circumstances, no appropriation of the right to use any water thereon could have attached to the Tattersfield land before she herself initiated the right to acquire title thereto from the United States. The alleged conveyance of a water right from the company to her could have no validity, for under the facts there was no water right to convey. Can it be said, though, that she acquired a right of appropriation subsequently to her entry of the lands in question? The supply of water had been cut off during the period of litigation over the Leon entry, and no water was used on the land until after Tattersfield had leased

the same to the company, and the water was not applied to the land by its owner, but by the lessee. Following the principles above set forth, we are of the opinion that a lessee of land cannot initiate an appropriation of water therefor which inures to the benefit of his lessor. The appropriation must be by the lessor. Immediately after the title to the land and water system passed to the Putnams, the receiver of the company canceled the Tattersfield lease and no further water was applied to the land. We are of the opinion from the law aforesaid and the facts in the case that the land owned by Tattersfield had never at any time had appurtenant thereto a right to use water from La Cienega Creek, and the judgment of the court denying her such right was proper.

There remains the question of the water right adjudicated by the court in favor of the Monthan land and certain land which had been leased by the state to the company during the year 1916. For the reasons set forth above in regard to the Tattersfield land, no right of appropriation of water to the state land has ever been initiated, and no right to the Monthan land was or could have been initiated prior to his entry of such land after the cancellation of the Bravo entry.

In 1919 the New Water Code went into effect. After that time, it was no longer possible to appropriate water under the law of Arizona for the purpose of irrigation by its mere beneficial user for that purpose upon land. Certain formalities were required to initiate and perfect the right. It does not appear from the record that these formalities were ever complied with so far as the Monthan land was concerned. We are therefore of the opinion that no right to the use of water for that land has ever been legally acquired by anyone.

The judgment of the superior court of Pima county is modified by striking therefrom that portion which establishes a water right appurtenant to the land in the S.E.¼ S.W.¼ of section 10, Tp. 16 S., range 16 E., G. & S. R. B. & M., being that land hereinbefore described as the Monthan land, and, as so modified, it is affirmed.

McALISTER and ROSS, JJ., concur.