Appeal of Basin Electric Power Cooperative from the Order of the State Board of Control in the Matter of the Petition of Basin Electric Power Cooperative for Change in Three Appropriations Diverting Water from the Laramie River through the Boughton Ditch, etc.

BASIN ELECTRIC POWER COOPERATIVE, Appellant,

v.

STATE BOARD OF CONTROL; Middle Laramie Water Users Association; Upper Laramie Users, Inc.; and Wheatland Irrigation District, Appellees.

WHEATLAND IRRIGATION DISTRICT and Middle Laramie Water Users Association, Appellants,

v.

STATE BOARD OF CONTROL; Basin Electric Power Cooperative; and Upper Laramie Users, Inc., Appellees.

Nos. 4791, 4817.

Supreme Court of Wyoming.

April 20, 1978.

Rehearings Denied May 25, 1978.

558

D. N. Sherard and R. A. Stacy, Wheatland, for Basin Elec. Power Co-op.

V. Frank Mendicino, Atty. Gen., and Jack D. Palma, II, Asst. Atty. Gen., Cheyenne, for State Bd. of Control.

John J. Rooney and Paul J. Hickey of Rooney, Horiskey, Bagley & Hickey, Cheyenne, for Middle Laramie Water Users Ass'n.

William R. Jones of Jones, Jones, Vines & Hunkins, Wheatland, for Wheatland Irrigation Dist.

George J. Millett, Laramie, for Upper Laramie Users, Inc.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

These consolidated appeals primarily concern the State Board of Control's decision not to grant the Basin Electric Power Cooperative the right to transfer certain historic closed-basin return flows, as requested in Basin's petition to change the use and point of diversion under certain acquired water appropriations. Basin's petition, filed pursuant to § 41-3-104, W.S.1977 [§ 41-4.1, W.S.1957, 1975 Cum.Supp.],[1] was contested by the Upper Laramie Users, Inc., the Wheatland Irrigation District (an organization then denominated as the Laramie River Water Users), the Middle Laramie Water Users Association, and certain other interested parties. After hearings in May and July, 1975, the Board granted Basin's petition and entered findings of fact and conclusions of law on May 6, 1976. Basin took

exception to certain of these findings and conclusions, and timely filed a petition for review. The Wheatland Irrigation District filed its own petition for review on July 23, 1976, which was later stricken by the district court for a failure to comply with the Wyoming Rules of Civil Procedure. The Middle Laramie Water Users Association did not file a petition for review. On January 25, 1977, the district court entered its order affirming the decision of the Board of Control. Basin has appealed only from that portion of the order which concerns the above-mentioned closed-basin return flows. The various water users associations have appealed from the district court's restriction of the issues reviewed below, and various determinations of the Board which they claim were not in conformity with the law or supported by substantial evidence. · ·

We will affirm the district court's affirmation of the Board's decision with respect to the handling of closed-basin return flows. There being no other issues properly before us, we will affirm all other aspects of the district court's order upholding the Board's decision.

Basin's petition to the Board of Control requested that three water appropriations, which it has acquired, be changed from agricultural uses to a preferred use for industrial purposes so that it would have

---

1. Section 41-3-104, W.S.1977 [§ 41-4.1, W.S. 1957, 1975 Cum.Supp.] provides:

"§ 41-3-104. Procedure to change use or place of use.

"(a) When an owner of a water right wishes to change a water right from its present use to another use, or from the place of use under the existing right to a new place of use, he shall file a petition requesting permission to make such a change. The petition shall set forth all pertinent facts about the existing use and the proposed change in use, or, where a change in place of use is requested, all pertinent information about the existing place of use and the proposed place of use. The board may require that an advertised public hearing or hearings be held at the petitioner's expense. The petitioner shall provide a transcript of the public hearing to the board. *The change in use, or change in place of use, may be allowed, provided that the quantity of water transferred by the granting of the petition shall not exceed the*

*amount of water historically diverted under the existing use, nor exceed the historic rate of diversion under the existing use, nor increase the historic amount consumptively used under the existing use, nor decrease the historic amount of return flow, nor in any manner injure other existing lawful appropriators.* The board of control shall consider all facts it believes pertinent to the transfer which may include the following:

(i) The economic loss to the community and the state if the use from which the right is transferred is discontinued;

(ii) The extent to which such economic loss will be offset by the new use;

(iii) Whether other sources of water are available for the new use.

"(b) In all cases where the matter of compensation is in dispute, the question of compensation shall be submitted to the proper district court for determination." [Emphasis supplied]

water to service its steam power generation requirements at its Laramie River Station near Wheatland, Wyoming. The appropriations in question are from the Laramie River, through the Boughton Ditch, and have historically been used for the irrigation of meadow lands located on the R. O. Corporation and Wallis Ranches, east of U. S. Highway No. 30 and north of State Highway No. 34, in Albany County. Basin's plan is to sever these water rights from the above lands and transport the water down the Laramie River for storage at the proposed Grayrocks Reservoir, there to be utilized at its power facility.

A unique factual situation is present in that a topographic divide separates the 3,730 acres historically irrigated under the Boughton Ditch. The total record rights of the appropriations under consideration are for 98.73 cubic feet per second of water, covering 7,388 acres. Basin admitted in its report to the Board that only

> "approximately 35% of the acreage entitled to irrigation water under the Boughton Ditch appropriations has been considered as actually irrigated."

Of the total acreage actually irrigated, 794 acres lie above and 2,937 acres lie below the topographic divide.

Above the divide, irrigation return flows are able to find their way back to the Laramie River for use by other appropriators. Below the divide, however, the irrigation return flows enter the Long Lake Basin, a geological enclosure which precludes the return of any waters to the Laramie

River for use by other appropriators. The record discloses that, as defined by the Board, there was a historic consumptive use [2] above and below the divide equal to 3,117 acre-feet of water. This figure was reached by determining the total amount of intensively and less intensively irrigated acreage, and then applying the Burman consumptive-use figure of 0.969 acre-feet per acre,[3] with downward adjustments for the less intensively irrigated acreage. For the purpose of considering a transfer of irrigation water rights, "consumptive use" was defined by the Board, in Conclusion of Law No. 6, as

> "the amount of irrigation water, exclusive of effective precipitation, stored soil moisture, or ground water that is consumed by the crop."

The amount of water consumptively used was found to be Basin's maximum seasonal entitlement. Basin claims that this amount (3,117 acre-feet) should be increased by the return flows below the topographic divide which enter the Long Lake closed basin—which it calculates would be an additional 2,215 acre-feet of water.[4] Basin makes this claim on the two-pronged theory that this amount was a necessary part of the irrigation of lands in the Long Lake closed basin and was historically lost to the Laramie River system.

On the other hand, the Board concluded—*as a matter of fact*—that these closed-basin return flows had not been "beneficially, consumptively used"[5] below the topograph-

---

**2.** As noted, the language employed in § 41-3-104, W.S.1977, supra, is "historic amount consumptively used." (fn. 1, supra)

**3.** The Burman consumptive-use figure represents an evapo-transpiration coefficient which takes into account various factors affecting the consumption of water by crops.

**4.** This additional quantity of return flow water was calculated by determining the amount of intensively irrigated acreage (1,921 acres) and less intensively irrigated acreage (1,015 acres) below the divide, and then applying the Burman consumptive-use factor (0.969) with downward adjustments for the less intensively irrigated acreage, as follows:

Intensive
  acreage: 1,921 acres × .969 = 1,861 acre-feet.
Less-intensive
  acreage: 1,015 × 1.1628 × 50% × .6 = 354
    acre-feet.

TOTAL = 2,215 acre-feet.

**5.** In Finding of Fact # 34, the Board found:
> "34. THAT return flows are not consumptively used below the divide and that such return flows are credited to the Laramie River System as hereinafter set forth in the Order."

In Conclusion of Law numbered 8, the Board said:
> "THAT the waters leaving the irrigated lands as return flows below the Topographic

ic divide and could not be transferred, *regardless of whether or not they return to the Laramie River system.*

## CONSTRUCTION OF § 41–3–104

Section 41–3–104, (fn. 1, supra) provides that when a change in use, or change in place of use of water is applied for, certain factors must be considered by the Board. These considerations are:

(a) The amount of water historically diverted under the existing use.

(b) The historic rate of diversion under the existing use.

(c) The historic amount consumptively used under the existing use.

(d) The historic amount of return flow.

The statute thus provides that the quantity of water transferred shall not affect the quantities of water contemplated by these factors—

"nor in any manner injure other existing lawful appropriators."

Basin's interpretation of the statute would lead to the conclusion that each of the above four limitations modify the general prohibition of injury to other appropriators. In other words—argues Basin—factors "a," "b," "c," and "d" above are irrelevant to a change-of-use application unless it can be shown that other appropriators are injured by the effect of one or more of them. According to this reasoning, it follows that since the closed-basin return flows do not return to the Laramie River, there is, therefore, no injury to other appropriators if more than the "historic amount" of water "consumptively used under the existing use" below the divide is transferred. (The quotes are from § 41–3–104.) Since this is so—says Basin—the statute is not offended by the seller-appropriator's transfer of the entire appropriation, regardless of what the facts show the historical-use factor to be.

On the other hand, other interested water users, together with the Board, contend that the statute imposes separate and independent restrictions on the amount of water which can be transferred—*regardless*

Divide, and entering Long Lake, are not being beneficially, consumptively used for the

*of the existence of injury to other appropriators.*

The Wyoming change-in-use statute, admittedly ambiguous, is unique to western water law, although its principles are not new or unfamiliar. The divergent contentions of the parties are themselves evidence of the ambiguity which characterizes § 41–3–104, supra. Since the statute is ambiguous, it falls to us to construe it, and in so doing we must view the language used by the framers in light of the purposes they intended to accomplish. *Wyoming State Treasurer ex rel. Worker's Compensation Division v. Svoboda,* Wyo., 573 P.2d 417, 420; *Frank v. City of Cody,* Wyo., 572 P.2d 1106, 1115; *Seyfang v. Board of Trustees of Washakie County School Dist. No. 1,* Wyo., 563 P.2d 1376, 1380; and *Hoffmeister v. McIntosh,* Wyo., 361 P.2d 678, 679, reh. den. 364 P.2d 823.

While the legislative declaration of intent and purpose is not binding upon us, it is, nevertheless, worthy of consideration as an aid to construction. *Wyoming State Treasurer ex rel. Workmen's Compensation Dept. v. Niezwaag,* Wyo., 452 P.2d 214; and *McFarland v. City of Cheyenne,* 48 Wyo. 86, 42 P.2d 413. The title to § 41 3 104, supra, as originally enacted, provided:

"AN ACT to create Section 41 4 1 of the statutes relating to procedure to change use or place of use of water right; *and providing only historic amount of water used or diverted under the right may be transferred.*" [Emphasis supplied] Session Laws of Wyoming, 1973, ch. 170.

The announced purpose, then of § 41 3 104 was to provide a procedure for those wishing to change a water right, *and* to place limitations on the amount of water which could be transferred. Basin argues with this, urging that the only purpose of the statute was to embrace what Basin interprets to be the basic premise laid down by this court in *Johnston v. Little Horse Creek Irrigating Co.,* 13 Wyo. 208, 79 P. 22, 24, where it is stated:

purposes for which the subject rights were acquired."

" . . . The *only* limitation upon the right of sale of a water right separate from the land to which it was first applied, and to which it has become appurtenant, laid down by any of the authorities, is that it shall not injuriously affect the rights of other appropriators. . ."[6] [Emphasis supplied]

We parenthetically observe that Johnston was decided in 1904 and did not contemplate a change-in-use problem. Likewise, it was not concerned with the issue of beneficial and consumptive use or a statute such as § 41-3-104. The issue in Johnston was whether or not an irrigation water right could be sold and transferred for the same use and was therefore severable from the land to which it was first applied and to which it had become appurtenant. In *this* context, we held that the only limitation upon the sale of a water right was injury to other appropriators. In other words, we said, *there being no other factors to consider,* a water right was such an interest in property as would permit of transfer and sale, assuming no injury to other appropriators. However, in discussing the various ramifications of this proposition, the author of the opinion was careful to note that there were no facts present which showed a sale of surplus water—there was no evidence of waste, and there was no indication that the parties to the deed were using more water than was actually required. We then went on to say that if there had been a showing of waste, the lower court's decision enjoining against interfering with the transfer might have required modification.

We interpret this decision to hold—then—that in a situation where the grantor of an irrigation water right sells to a grantee who intends to make the same use of the right—in circumstances where evidence of surplus and waste is not present and therefore there is no issue of beneficial and/or consumptive use, and in circumstances where there are no statutory inhibitions against the sale—the only limitation upon such a transfer of a water right from the land to which it was first applied is that it

"shall not injuriously affect the rights of other appropriators."[7]

However, Basin, utilizing its interpretation of the *Johnston* holding and in seeking to apply it to the facts of this case, would conclude that, since there was no injurious effect upon the rights of other appropriators, then there is no statutorily imposed limitation upon the right to transfer a water right. We cannot agree. The situation here is so different from that of *Johnston* that the narrow rule of that case, as urged by Basin, is of little value to these deliberations. Here we have a statutory direction not extant when *Johnston* was decided; and here the issue is beneficial, consumptive use, where—in *Johnston*—no such issue was present.

■ We readily acknowledge that the statute incorporates certain change-of-use concepts previously recognized by this court. See, Comment: "Changing Manner and Place of Use of Water Rights in Wyo-

---

**6.** Immediately following this quoted language from *Johnston,* we said:

" . . . In other words, the burden upon the use must not be enlarged beyond that which rested upon it under the original appropriation, and while in the hands of the original appropriator as he was entitled to and *did use it.* This principle is the necessary result of the fact that the only property in the water owned by the appropriator is a right to use it as measured by its appropriation." 79 P. 22, 24–25. [Emphasis supplied]

**7.** In the article entitled, "Changing Manner and Place of Use of Water Rights in Wyoming," Wyo. Land and Water L.Rev., Vol. X, No. 2, at page 457, the author says:

" . . . That Mr. Justice Potter correctly stated the law in *Johnston* with reference to the sale and change of water rights can hardly be the subject of debate. The continued application of these rules to Wyoming water rights was severely curtailed by the 1909 Legislature when it enacted a statute providing that, 'Water rights cannot be detached from the lands, place or purpose for which they are acquired, without loss of priority.' The statute was a radical departure from the common law and has been termed 'a direct legislative reversal of the *Johnston* case.'" [Footnotes omitted]

ming," Wyo. Land and Water Law.Rev., Volume X, No. 2, 455, 466 (1975). We cannot, however, presume that the *only* purpose of a statute is to declare what has, prior to its enactment, been declared to be the law. There would be no reason for its enactment if that were so. *United States v. Douglas-Willan Sartoris Co.,* 3 Wyo. 287, 22 P. 92. In ascertaining legislative intent, we must look to the mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of the law and all other prior and contemporaneous facts and circumstances. *Carter v. Thompson Realty Co.,* 58 Wyo. 279, 131 P.2d 297.

■ While this court has for many years recognized that one of the fundamental principles applicable to any transfer of water rights for change in use is the avoidance of injury (*Johnston v. Little Horse Creek Irrigation Co.,* supra), equally fundamental is the principle which holds that an appropriator obtains a transferable water right only to the extent that he has put his appropriation to a beneficial use. Our statutes provide:

" . . . Beneficial use shall be the basis, the measure and the limit of the right to use water *at all times,* not exceeding the statutory limit . . . ." [Emphasis supplied] Section 41–3–101, W.S.1977 [Section 41–2, W.S.1957].

■ We have previously said that the water right of an appropriator is limited to beneficial use, even though a larger amount has been adjudicated. *Quinn v. John Whitaker Ranch Co.,* 54 Wyo. 367, 92 P.2d 568, 570–571, and *Budd v. Bishop,* Wyo., 543 P.2d 368, 373. The decreed amount of water may be prima facie evidence of an appropriator's entitlement (*Quinn,* supra), but such evidence may be rebutted by showing actual historic beneficial use. Beneficial use is not a concept which is considered only at the time an appropriation is obtained. The concept represents a continuing obligation which must be satisfied in order for the appropriation to remain viable. The state's abandonment statutes, §§ 41–3–401 and 41–3–402, W.S.1977 [§§ 41–47.1 and 41–47.2, W.S.1957, 1975 Cum.Supp.], are recognition of this requirement. See also, *Budd v. Bishop,* supra. This principle announced in *Johnston,* supra, at 79 P.: 24, continues to be the law to this day. We said in *Johnston :*

"As an appropriator of water obtains by his appropriation that only of which he makes a beneficial use, it necessarily follows that *he cannot sell surplus water which he does not need,* while retaining his original appropriation; . . . " [Emphasis supplied]

As we have heretofore observed, the *Johnston* decision indicates that if the seller-appropriator or the buyer were shown to have committed waste or that they intend the commission of waste—the court would interfere.

The law of Colorado fully supports the suggested inter-relationship between the principles of avoidance of injury and beneficial use in the context of changes of use or changes of place of use. In *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 272 P.2d 629, reh. den. 272 P.2d 636, the Colorado Supreme Court observed:

"Petitioner contends, however, that it is entirely within the right of an appropriator of water to enlarge upon his use, and now that the City of Golden is the owner, it may enlarge upon the use to the extent of the entire decree. Counsel for petitioner here confuse two altogether different principles. This doctrine even on behalf of an original appropriator, may be applied only to the extent of use contemplated at the time of appropriation. It has no application whatever to a situation *where a decree is sought for change of point of diversion or use. There the right is strictly limited to the extent of former actual usage.* 'The right to change the point of diversion is, of course, nonetheless a qualified right because petitioner acquired it by purchase.' *Fort Lyon Canal Co. v. Rocky Ford Co.,* 79 Colo. 511, 515, 246 P. 781, 782.

"Although the expression 'Duty of Water', in the opinions of some present-day scholarly hydrologists and technical engineers, may be outmoded, provincial, unscientific, and otherwise objectionable, nevertheless it is a term well understood and accepted by every rancher and farmer who has had practical experience in the artificial irrigation of land for the production of crops. It is that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon. It is not a hard and fast unit of measurement, but is variable according to conditions. . . . In matters concerning change of point of diversion, it is the gauge by which volume of prior use is determined. *Where the entire amount fixed by the decree was reasonably required in the proper irrigation of the lands to which first applied, then the whole priority properly may be changed for similar usage; but where such irrigation did not require the entire volume of the decree, then only that portion may be changed which previously had been necessary for proper irrigation.* It is not a question of whether the amount of water decreed was adequate, but whether it was excessive. *The extent of needed use in original location is the criterion in considering change of point of diversion.* This, of course, is premised upon the assumption that whatever of the decreed water was not properly used remained in the stream." [Emphasis supplied] 272 P.2d at 634–635.[8]

In other words, the amount of water originally decreed or disclosed in a water permit is not necessarily the amount which may be transferred to a new place of use. In Colorado, at least, the amount which may be transferred is limited to the "Duty of Water," which is defined as the amount reasonably required for proper irrigation

under the original appropriation. Contra, *W. S. Ranch Company v. Kaiser Steel Corporation,* 79 N.M. 65, 439 P.2d 714, where the change-in-use petitioner was allowed to transfer the entire amount of the decreed water right regardless of subsequent actual beneficial use.

■ The key to understanding the application of beneficial-use concepts to a change-of-use proceeding is a recognition that the issues of nonuse and misuse are inextricably interwoven with the issues of change of use and change in the place of use. This is true even without the formal initiation of abandonment proceedings under the statutes. If an appropriator, either by misuse or failure to use, has effectively abandoned either all or part of his water right through noncompliance with the beneficial-use requirements imposed by law, he could not effect a change of use or place of use for that amount of his appropriation which had been abandoned. See *Rocky Mountain Power Company v. White River Electric Association,* 151 Colo. 45, 376 P.2d 158, 161, and *Flasche v. Westcolo Co.,* 112 Colo. 387, 149 P.2d 817. In the course of criticizing previous decisions of the Colorado Supreme Court, which held that the issue of abandonment was not properly a part of a change-of-use proceeding—a position subsequently changed by enactment of Rule 99, C.R.C.P.—the Court of Appeals of Colorado stated in *Farmers' High Line Canal & Reservoir Co. v. Wolff,* 23 Colo.App. 570, 131 P. 291, 294–295:

" . . . In our opinion it was an unfortunate day for the public welfare and for the owners of legitimate water rights, based upon actual appropriation, when the Supreme Court felt compelled to rule that abandonment could not be made an issue in this special statutory proceeding for a change in the point of diversion. There is no time so opportune, and no other proceeding so appropriate, for trying that issue as when, under a petition of this nature, all the ditches,

---

**8.** The last-mentioned assumption seems to presume that diligent water administration would prevent unneeded excess water from being diverted in the first place. As will be pointed out in this opinion, this is not always the case.

owners, and claimants of water rights are in court; and the decrees, the use of water, the conditions on the stream, the quantity of return waters, the quantity of an entire decreed appropriation to a ditch, whether owned in severalty or as tenants in common by individuals, or by a corporation, to which the person seeking the change is entitled, are before the court for consideration and determination. That rule has become the excuse for many actions ostensibly to change the point of diversion of waters appropriated, while the real purpose and effect is to revive or give life to and make effective a mere paper appropriation of water that has never been applied to a beneficial use by the claimants, and to encourage speculation in such excess decrees masquerading under the name of 'water rights,' and resulting in serious and irreparable loss to bona fide appropriators. It puts a premium on 'watered stock' in the irrigation system that deals with and controls the most important element in the growth of agricultural and horticultural products in this arid region, viz., water. However justifiable, or even necessary, the ruling may have been, its effect has been vicious. When once the change has been granted, there is no proceeding yet discovered that affords appropriate relief within the reach of a claimant with limited means. It has not been explained, and we do not know how abandonment can be predicated of a water right that, although having lain dormant for many years, has been given life and strength and value by decree granting its use at a new point of diversion. . . . "

Prior to the enactment of § 41–3–104, supra, the laws of Wyoming did not clearly recognize the role played by the concept of beneficial use in the context of a change-of-use proceeding. Emphasis was placed, in cases where such changes were allowed [9], on the avoidance of injury to other appropriators. Commentators and those involved in water administration, however, came to realize the great disparity between the actual practices of water users and adjudicated water rights. One writer observed:

"Most of the western states experience significant deviations between the actual practices of water users in the field and the information recorded in the office of the water administration officials. The extent of the problem, and the seriousness of the deviations in the other states is not known, but the magnitude of the problem in Wyoming is enormous and is apparently statewide. In 1955, the records of the State Engineer showed that the adjudicated, direct flow water rights from the Little Laramie River totaled 417,000 acres, but the acreage actually irrigated by direct flow from the Little Laramie River was only 200,000 acres, which is only 48% of the adjudicated acreage. In the North Platte River Basin in central and eastern Wyoming, direct flow surface water rights are adjudicated to 890,554 acres, but only 569,131 acres, 64% of the adjudicated acreage, were actually irrigated as of 1967. In one reach of a river in the water-rich highlands of west central Wyoming, direct flow surface water rights are adjudicated to 10,839 acres, but only 6,600 acres are actually irrigated, 61% of the acreage shown to be irrigated by the State Engineer's records." [Footnotes omitted] McIntire, "The Disparity Between State Water Rights Records and Actual Water Use Patterns," Vol. V, No. 1, Wyo.Land and Water L.Rev. 23, 26–27 (1970).

One of the reasons for this disparity was explained as follows:

"The procedure established for supervision of the water laws, together with the number of men and the amount of equipment allotted for the job, makes detection of water law violations difficult. Wyoming water rights are limited to a maximum rate of flow of water measured at the point where the water is diverted from the source, the headgate.

9. For an excellent analysis of the history of transfers of water rights in Wyoming, see Trelease and Lee, "Priority and Progress—Case Studies in the Transfer of Water Rights," Vol. I, No. 1, Wyo.Land & Water L.Rev. 1 (1966).

566

A water commissioner's observations at the headgate and regulations of the headgate in accordance with the priority give no information or control over the place of water use, the number of acres upon which the water is applied or the amount of water actually applied. Furthermore, under the 'call system' of administration, no control is exercised upon most streams unless a call for control is made, so that in the absence of a call, there are generally no records available even to indicate the rate of diversion." [Footnotes omitted] McIntire, supra, 33–34.

Keeping these various principles and problems in mind, we turn to the language of § 41–3–104, supra, in our effort to construe the statute. We must give effect, if possible, to every word, clause and sentence of the statute. *State ex rel. Benham v. Cheever,* 71 Wyo. 303, 257 P.2d 337, 340–341; and *Wheatland Irrigation District v. Short,* 80 Wyo. 136, 339 P.2d 403, 409. Each of the clauses containing the restrictions on the quantity of water which may be imposed in the granting of a petition to change the use or place of use of a water right, is separated by the word "nor." The conjunction "nor" performs the same function in negative propositions as does the word "or" in positive propositions, i. e., marking distribution, an alternative, or apposition. *Coxson v. Doland,* N.Y., 2 Daly's 66, 67. The word "or" is usually used in the disjunctive sense, and when two clauses are expressed in the disjunctive, this generally indicates alternatives, requiring separate treatment. *Matter of Adoption of Voss,* Wyo., 550 P.2d 481, 485. Cf., *Manning & Martin v. State Board of Equalization,* 58 Wyo. 425, 133 P.2d 373, 374. In other words, the subject of each clause should be considered separately, without requiring that the subjects both be satisfied. Utilizing these concepts in construing § 4–3–108, W.S.1977 [§ 41–9.1, W.S.1957, 1975 Cum. Supp.], we are forced to the conclusion that the statute forecloses anyone desiring to effect a change of use from transferring more water than has been historically consumptively used, *regardless* of the injury or lack thereof to other appropriators. Such a

conclusion is fortified by the consideration which takes into account the fact that the statute speaks of both consumptive use *and* return flows.

In the usual situation—where return flows feed the stream—an appropriator would be allowed to change only the amount of his consumptive use because other appropriators would otherwise be injured. In this respect, the consumptive-use and return-flow factors overlap. Where there are no return flows to the stream, as is the situation here with respect to application of water below the divide, the return-flow factor has no relevance. Nevertheless, the consumptive-use factor must still be applied to determine the amount of water which can be transferred. Any other construction would render the consumptive-use requirement of the statute meaningless. Although of less importance in the normal return-flow situation, the consumptive-use limitation becomes significant in cases like that presented here and in other cases where there is a disparity between actual usage and adjudicated rights.

To the extent, then, that the historic consumptive-use limitation in this statute goes beyond the purpose of avoiding injury to other appropriators, the legislature must have intended to address the objective of assuring that water is beneficially used. What we have said here is supported by the eminent water-law authority, Frank J. Trelease, when he wrote:

"The new law . . . recognizes that the exceptions had practically swallowed the rule and permits all changes of water rights to new uses or places of use that do not injure other appropriators *or increase the historic use of water in quantity, rate of diversion or amount of consumption.*" [Emphasis supplied] Vol. X, No. 2, Wyo.Land & Water L.Rev., supra, 465, quoting from "Report of Water Resources Committee," 6 Natural Resources Law 469 (1973).

We conclude that the language used in § 41–3–104, supra, makes manifest the legislative intent suggested in the act's title,

particularly when the common law on the subject is considered. We hold, therefore, that the Board of Control properly interpreted § 41–3–104, supra, as requiring separate consideration of and limitation to historical consumptive uses—even though injury to other appropriators was not at issue.

## "BENEFICIAL CONSUMPTIVE USE" [10]

Basin contends that the Board acted arbitrarily and not in conformity with the law by restricting Basin's right of transfer to the irrigation water consumed by crops in the Long Lake closed basin instead of all water allocated under the prior appropriation. In support of this proposition, Basin points out that it is impossible to avoid some runoff from an irrigation operation, citing 2 Kinney on Water Rights and Irrigation at page 1614, and thus the closed-basin return flows herein were a necessary part of the irrigation process and the beneficial use of these appropriated waters. Basin, therefore, is challenging two aspects of the Board's decision: (1) Conclusion of Law No. 6, supra, which defines consumptive use as essentially the amount of water consumed by the crop; and (2) Finding of Fact No. 34 (fn. 5, supra), which discloses a finding that return flows below the topographic divide were not consumptively used.

■ With regard to the definition of consumptive use, a review of the case law discloses that, for the purposes of transferring an irrigation water right, the concept of consumptive use has been consistently limited to the amount of water, less other contributing sources of water, which will result in the successful growing of a crop. *Farmers High Line Canal & Reservoir Co.,* supra, 272 P.2d at 634; *Green v. Chaffee Ditch Company,* 150 Colo. 91, 371 P.2d 775, 780; *Enterprise Irr. Dist. v. Willis,* 135 Neb. 827, 284 N.W. 326, 329; *In re Birdwood Irr. Dist., Water Division No. 1–A,* 154 Neb. 52, 46 N.W.2d 884, 888; and *Application of Frenchman Valley Irrigation District,* 167

Neb. 78, 91 N.W.2d 415, 428. See also, Comment, "Determining Quantity in Irrigation Appropriations," Vol. IV, No. 2, Wyo. Land & Water L.Rev. 501. It seems clear that, in a proper case, consideration should also be given to the amount of water lost by evaporation and seepage while the water is in transit from the headgate to the place of use. See, *Green v. Chaffee Ditch Company,* supra, at 780. This factor is, however, of no concern in the present litigation since the record discloses that Basin assigned no value to conveyance losses in the Boughton Ditch.

The central question is whether or not the closed-basin return flows herein were beneficially consumptively used. This is, of course, a question of fact—assuming the proper standards are employed. It must be emphasized that we are here concerned with both beneficial use *and* consumptive use. We note, consistent with the principles outlined in *Farmers Highline Canal & Reservoir Co. v. City of Golden,* supra, that these concepts cannot in all cases be equated. It has been said that "[b]eneficial use is not what is actually consumed but what is actually necessary in good faith." 1 Wiel, Water Rights in the Western States, § 481, at 509. In this sense, beneficial use is that which is contemplated by the phrase "duty of water," which itself centers on the amount "actually necessary in good faith." 1 Clark, Waters and Water Rights, § 55.3, at 382. It is also stated:

"In a broad sense, and for the purposes of accurate measurement also, the concept of consumptive use involves evapotranspiration *and actual requirements for irrigation* or municipal or domestic uses. . . . " [Emphasis supplied] 1 Clark, supra, § 55.2, at 381.

We recognize that there may be circumstances where the beneficial use of water exceeds the actual consumptive use thereof. Such circumstances should be considered within the context of the change-in-use pro-

---

**10.** As noted in Footnote 5, the Board found that the return flows below the divide were not consumptively used, and the conclusion of law recites that they are not being

"beneficially, consumptively used for the purposes for which the subject rights were acquired."

ceeding when appropriate. In these cases, the definition of consumptive use can be expanded to include the actual needs for proper irrigation—beyond the less-inclusive concept of *crop* consumptive use. Such flexibility in the definition of consumptive use allows for the proper determination of beneficial use. The determination of beneficial use—in such proceedings—is, after all, a question of fact which depends on the circumstances of each case. *City and County of Denver v. Sheriff,* 105 Colo. 193, 96 P.2d 836, 842.

In the instant case, the Board has found, as a factual matter, that beneficial use of Basin's predecessor is equal to the historic crop consumptive use on these irrigated lands. As has been noted—Conclusion of Law No. 8 says the return flows below the divide are not *"being beneficially consumptively used. . . ."* Such a conclusion finds adequate support in the findings of fact which included not only calculations of actual historic consumptive use, but indications that the Board made an on-site inspection and reviewed aerial photographs to ascertain the nature of the irrigated acreage in question. As stated in Conclusion of Law No. 10:

> "THAT certain matters determined by the Board relative to . . . the water supply to intensively and less-intensively irrigated lands . . . have been arrived at through independent study by the Board and are based upon the Board's specialized knowledge in the field of practical water administration. . . ."

With respect to such factual matters, this court has always accorded deference to the Board's peculiar knowledge and expertise, as well as the realities and records pertaining to the use or nonuse of water. *Kearney Lake, Land & Reservoir Company v. Lake De Smet Reservoir Company,* Wyo., 475 P.2d 548, 549; *Wheatland Irrigation District v. Pioneer Canal Co.,* Wyo., 464 P.2d 533, 534; and *Laramie Rivers Co. v. Le Vasseur,* 65 Wyo. 414, 202 P.2d 680, 694–695.

We find that the Board's response to the central question is amply supported by the evidence, when viewed in the light of the accepted definition of "consumptive use," and its importance within the context of acquired water rights. The evidence clearly discloses that only approximately 2,451 acre-feet of water had been historically beneficially, consumptively used below the topographic divide.[11] The remaining 2,215 acre-feet of water (see fn. 4) that reached the closed basin was lost essentially to surface evaporation and subsurface recharge.[12] Basin would have us embrace a position holding that this amount of water was beneficially, consumptively used merely because usually some excess water is incident to the irrigation process. This we cannot do. As pointed out in the Board's brief:

> "To allow Basin Electric the right to waters diverted in excess of that amount necessary for the production of the crops in question would be to grant it a windfall based upon application of the Boughton Ditch water in excess of that which was beneficially used. . . ."

If the amount necessary in good faith for crop production below the divide was only

---

11. The figure of 2,451 acre-feet is not expressed in the Board's order, but is implied by a reading of Findings of Facts Nos. 21 and 27. There were 1,921 acres of intensively irrigated land and 1,015 acres of less intensively irrigated land below the divide. As a result, total consumptive use below the divide can be calculated as follows:

Intensive
acreage: $0.969 \times 1,921$ acres $= 1,861$ acre-feet.
Less-intensive
acreage: $0.969 \times 1,015$ acres $\times .60 = 590$ acre-feet.

TOTAL = 2,451 acre-feet.

12. The record discloses that since this excess water flowed into Long Lake, most of the excess was lost to surface evaporation and a much smaller amount of subsurface recharge. To those of us who are not schooled in water measurements, it is noted that an acre-foot of water is equal to 325,851 gallons of water. Trelease, Water Law, at 21 (2nd ed. 1974). We are here concerned, then, with a waste of approximately 722 million gallons of water during the irrigation season.

2,451 acre-feet of water, any water in excess of that amount—excluding carriage water not relevant here—served no useful purpose insofar as Basin's predecessors were concerned. See, 1 Clark, Waters and Water Rights, § 55.3, at p. 385.

Over-application amounting to waste must be understood in a relative sense. In the instant case, excess waters above the divide historically returned to the river for use by other appropriators. Basin admits it is not entitled to this amount of water, because, under § 41–3–104, supra, it is not entitled to decrease the amount of return flows. Were it not for the unique geographic situation present here, excess waters below the divide would also return to the river for use by other appropriators. Had this excess amount of water not been diverted from the river in the first instance, it would have been available for use by other appropriators.[13] It is the diversion of more water than can be consumed in good faith in the irrigation process which creates the wasteful, non-beneficial use situation now before us. This is not to say that an appropriator must find a way to return such waters to their source—it is only to say that an appropriator does not acquire a water right in water which he historically has not beneficially used. Not having acquired a water right therein, he or his successor is not entitled to change the use of such waters.

After all, this analysis and conclusion is no more than a restatement of the doctrine of beneficial use as it is applied to wasteful practices. An appropriator's right is limited in accordance with the law declaring that the volume of water to which an appropriator is entitled is that quantity, within the limits of the appropriation, which he can and does apply to beneficial uses. *Johnston v. Little Horse Creek Irr. Co.,* supra; and *Quinn v. John Whitaker Ranch Co.,* 54 Wyo. 367, 92 P.2d 568, 570. The waters belong to the public, and an appropriator cannot acquire a right that permits him to use more than is reasonably necessary for beneficial purposes. *Farm Investment Co. v. Carpenter,* 9 Wyo. 110, 61 P. 258; *Quinn v. John Whitaker Ranch Co.,* supra, 571; and 93 C.J.S. Waters § 178, at 929. While it appears that excess water may be reasonably necessary for irrigation, and that under certain circumstances an appropriator may put excess waters to a beneficial use, and thereby preserve his rights therein (*Ide v. United States,* 263 U.S. 497, 44 S.Ct. 182, 68 L.Ed. 407; and *Bower v. Big Horn Canal Association,* 77 Wyo. 80, 307 P.2d 593, 601), if such is not in fact the case, and water is lost insofar as the stream is concerned, then the appropriator has failed to acquire a water right to the amount of the excess. Where he cannot show, or the facts do not otherwise reveal, that the excess is necessary to the production of the crop, the appropriator is then precluded from enlarging the amount of water historically consumptively used through the device of transferring his original water right to another use or place of

13. The following paragraphs from a May 10, 1976, letter from the Board to Basin, in response to Basin's objections to the proposed Board order, disclose the Board's attitude on this subject:

"It should perhaps be pointed out that the definition for consumptive use was a necessary part of the Order because of special conditions involved in this change by the location of the topographic divide and Long's Lake Basin. Furthermore, much of the water in Long's Lake, we feel, results from excessive or insufficient irrigation practices of water application and is not a part of the beneficial consumptive use of the purpose for which these rights were acquired.

"In response to your comments on Paragraph 8 of the 'Conclusions of Law', it should be pointed out that it should be part of administrative regulation to deny any appropriator water, though his right may be in priority, when he is found to be wasting water. Better management by the appropriator, as well as better water administration, would have eliminated this waste, and thereby reduced the total diversion. It should also be pointed out that an illegal use or excessive diversion does not establish a water right in Wyoming."

use. A different construction of the statute would allow appropriators to speculate with unused waters—a policy never embraced by this court. See, *Scherck v. Nichols*, 55 Wyo. 4, 95 P.2d 74, 78. Such a construction would also render the statute meaningless and would be tantamount to a refusal to recognize the intent of the legislature and the purpose of the statute. While the case law dealing with changes in use is, indeed, greatly concerned with the avoidance of injury to other appropriators, in which case a change may be prohibited or limited, the law also recognizes that limitations must also be imposed to discourage wasteful practices and to encourage the proper distribution of waters to those who need them and can put the water to the maximum reasonable, beneficial use. The placement of these various functions within the context of change-of-use proceedings, as contemplated by § 41-3-104, supra, serves to aid this maximization process.

■■■ Since the Board, in essence, found that excess waters below the divide had historically gone to waste, Basin could, therefore, acquire no right to the excess. See, Trelease, "The Concept of Reasonable Beneficial Use in the Law of Surface Streams," Vol. 12, No. 1, Wyo.L.J. 1, 14, 16. As a result, Basin's argument, that a denial of the right to transfer such waters is a taking without due process, is without merit.

We hold that the Board's action in limiting the amount which could be transferred to 3,117 acre-feet of water was reasonable and in conformity with the law.

## REMAINING ISSUES

■■■ In Case No. 4817, the appellants (Wheatland Irrigation District and Middle Laramie Water Users Association) raise a number of alleged errors with respect to the Board's Findings of Fact and Conclusions of Law, in addition to those raised by Basin. The court below, however, entered an order limiting the issues to those raised by Basin in its petition for review—there being no other petitions filed. Appellants contend that the filing of a petition for review, pursuant to Rule 72.1(c), W.R.C.P.,[14] by any party is sufficient to raise all the issues which were before the administrative agency. We cannot agree.

Although Rule 72.1(c), supra, provides that after a petition for review has been filed no other pleadings shall be necessary, the administrative appeal by the party affected is initiated by the filing of a petition for review. See, *Snell v. Ruppert*, Wyo., 541 P.2d 1042, 1047. The necessity for filing a petition for review by each affected party is grounded on the need to have such petitions clearly frame the issues before the court for review, and to set forth the grounds relied upon for the disposition of those issues. Rule 72.1(f), W.R.C.P.; and *Tri-County Electric Association v. City of Gillette*, Wyo., 525 P.2d 3, 10. See, *Rolfes v. State ex rel. Burt*, Wyo., 464 P.2d 531, 532. Only in this manner can the trial court be assisted in carrying out its task of conducting orderly proceedings. See, *Bruegman v. Johnson Ranches, Inc.*, Wyo.,

14. Rule 72.1(c), W.R.C.P., provides:

"(c) *Petition for Review; Other Proceedings for Review.* The proceedings for judicial review under this rule shall be instituted by filing a petition for review in the district court having venue. No other pleading shall be necessary, either by petitioner or by the agency or by any other party. All appeals from administrative agencies and all proceedings for trials de novo reviewing administrative action shall be governed by this rule. The relief, review, or redress available in suits for injunction against agency action or enforcement thereof, in actions for the recovery of money, in actions for a declaratory judgment of rights, status, or legal relations

based on administrative action or inaction, in actions for mandamus to compel administrative action, and in application for writs of certiorari and prohibition to review or prevent administrative action shall be available by independent action and shall also be available under a petition for review. In any such suit, action, application or petition, the court may grant, in addition to specific relief prayed for, any relief or redress to which the pleadings, record, and evidence show plaintiff or petitioner is entitled.

"No summons shall be necessary. Copies of the petition shall be served without unnecessary delay upon the agency and the parties in accordance with Rule 5."

520 P.2d 489, 491. The district court's limitation of issues herein was, therefore, proper and they are not now properly before this court.

The district court's order, affirming the decision of the Board of Control, is affirmed.

Affi. ied.

McCLINTOCK, Justice, with whom RAPER, Justice, joins, dissenting.

I do not disagree with many of the basic legal propositions stated by the majority. I accept their interpretation of the change-of-use statute [1] as one intended to restrict the extent of a water right which can be transferred to a new use to that quantity of water which historically has been consumptively used under the right sought to be transferred. However, I deny that the legislature may constitutionally so limit a pre-1909 [2] right which, as I read the decision of this court in *Johnston v. Little Horse Creek Irrigating Co.*, 13 Wyo. 208, 79 P. 22 (1904), constituted a property right to the full extent that the same had been actually and beneficially used, the only limitation upon the transfer being that it should "not inju-

riously affect the rights of other appropriators." 13 Wyo. at 228, 79 P. at 24. While I would concede the right of the legislature to impose any restrictions it saw fit upon the transfer of water rights initiated after the enactment of the 1973 law and probably would agree that that restriction would be applicable to water rights which had their inception after enactment of Ch. 68, S.L. of Wyoming 1909,[3] I believe that to apply the present change-of-use statute to rights which accrued before 1909, whether state or territorial, is an unwarranted and undue interference with and deprivation of property without due process of law, in violation both of the 14th Amendment to the Federal Constitution [4] and § 6 of Art. I of the Wyoming Constitution.[5] I would therefore hold this new restriction in change of use to be unconstitutional and void as to pre-1909 rights, which include the right here in question.

As I read *Johnston* —and I think consistently with the majority—the mere allowance of a water right for a designated quantity of water per second of time for a described number of acres of land did not vest the appropriator with the full and unrestricted right to take as much water from

1. Ch. 170, § 1, S.L. of Wyoming 1973, as amended by Ch. 23, § 1, S.L. of Wyoming 1974; now codified as § 41–3–104, W.S.1977.

2. Following *Johnston* the legislature enacted Ch. 97, S.L. of Wyoming 1905, which consistent with the language in that opinion declared invalid any transfer of water rights from the lands for which acquired "which shall be injurious to any prior or subsequent appropriator." The *Johnston* case came under attack from the then State Engineer as being based on an erroneous understanding of the facts and Elwood Mead, Wyoming's first State Engineer and considered the father of the irrigation law in Wyoming, went so far as to express the wish that the legislature "will overcome the mischievous tendencies of the Supreme Court decision in *Johnston v. The Little Horse Creek Ditch Company * * *.*" (See Ninth Biennial Report of the State Engineer 1907–1908, pp. 73–74, 76). Ch. 68, § 1, S.L. of Wyoming 1909 provides in part that
"* * * Water being always the property of the State, rights to its use shall attach to the land for irrigation, or to such other purpose or object for which acquired in accordance with the beneficial use made and for which the right receives public recognition,

under the law and the administration provided thereby. *Water rights cannot be detached from the lands, place or purpose for which they are acquired, without loss of priority.*" (Emphasis added)
The history of the Wyoming law with respect to changes of use, limitations thereon, and exceptions to the limitations is well set forth in Priority and Progress—Case Studies in the Transfer of Water Rights, by Frank J. Trelease and Dellas W. Lee in 1 Land and Water Law Review 1 (1966). The matter is further explored in a comment, Changing Manner and Place of Use of Water Rights in Wyoming, 10 Land and Water Law Review 455 (1975) by Dan B. Riggs. It is clear that the year 1909 marks an important division point in water law in this respect.

3. See n.2, supra.

4. "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *."

5. "No person shall be deprived of life, liberty or property without due process of law."

the stream as he saw fit within that allowance. As pointed out by the majority and as set forth in *Johnston*,

"As an appropriator of water obtains by his appropriation that only of which he makes a *beneficial* use, it necessarily follows that he cannot sell surplus water which he does not need, while retaining the original appropriation." (Emphasis added) 13 Wyo. at 227, 79 P. at 24.[6]

But within that limitation, and also as quoted by the majority,

" * * * [t]he only limitation upon the right of sale of a water right separate from the land to which it was first applied, and to which it has become appurtenant, laid down bv any of the authorities, is that it shall not injuriously affect the rights of other appropriators. * * " 13 Wyo. at 228, 79 P. at 24.[7]

To the best of my knowledge, it has been a fact of irrigation practice from its very inception that all water applied to a given tract of land for the irrigation of crops or grass thereon is not totally consumed in the process and some of that water so applied, however careful the irrigator may be, will find its way back to the stream. Under the circumstances that have usually prevailed, the first appropriator took water for irrigation, others came along and made similar appropriations, and due to the fact that none of them would require the full amount of their nominal appropriations at all times and the further fact that a certain amount of the water used by them usually returns to the stream, the total nominal appropriations from the stream can substantially exceed the amount of water that is flowing in the stream at any one time and actually available for use. The junior appropriators are said to acquire a vested right in the continuance of conditions as of the time of their appropriations.[8]

These vested rights of junior appropriators as recognized and declared in *Johnston* and other decisions[9] represent a material limitation upon the property right of the

---

6. The concept of beneficial use has been a part of the Wyoming law from its inception. See Trelease, The Concept of Reasonable Beneficial Use in the Law of Surface Streams, 12 Wyoming Law Journal 1 (1957–58). Section 14, Ch. 55, S.L. of Wyoming 1888 directed that the priority of right to use water should be limited to "so much thereof as may be necessarily used and appropriated for irrigation or other beneficial purposes * * *." It is said in *Quinn v. John Whitaker Ranch Co.*, 54 Wyo. 367, 378, 92 P.2d 568, 571 (1939):

"The waters belong to the public or the state, and an appropriator cannot acquire a right that permits him to use more than is reasonably necessary for beneficial purposes."

7. I do not entirely understand the majority's distinction of *Johnston* on the basis that it involved a change in place of use while the case at bar is concerned with a change from agricultural to industrial use. That this court intended its ruling to be a broad one is indicated by its statement that although the water right was not to be considered a "floating right", the opinion permits change to other land to which the right becomes appurtenant or "to *other equally beneficial uses.*" Rejecting the argument that an irrigation right should be inseparably attached to the land for which acquired "and cannot be separated therefrom in any manner by sale, by any *other equally beneficial use,* or otherwise," the court indicated that much injustice could thereby result. (All emphasis added)

8. See Trelease and Lee, supra n.2, 1 Land and Water Law Review at 26. As pointed out by the authors, and notwithstanding the existence of the 1909 statute declaring inseparability, changes of use have been permitted as to pre-1909 rights and the administrative practice has been to determine the time that the appropriation has been actually and customarily used, the quantity of water that has been taken from the stream and the amount which has been returned thereto after use. Usually, the quantity so historically taken, less the amount which returns to the stream, being the consumptive use under the right, is the limit of the quantity which may be transferred, whether to a similar use in the same watershed (*Pioneer Canal Co.* case, 1 Land and Water Law Review at 34) or into another watershed (*Wheatland Irr. Dist.* case, id. at 40). The reduction in the amount of water which may be transferred eliminates any possibility of injury to junior appropriators and the rule of *Johnston* is applied. I note in passing that except for the clause limiting the transfer to the amount consumptively used, the 1973 statute appears merely declarative of this historical practice.

9. Pertinent Colorado cases so holding are summed up in *City of Westminster v. Church*, 167 Colo. 1, 445 P.2d 52, 56 (1968). See also *East Bench Irr. Co. v. Desert Irr. Co.*, 2 Utah 2d 170, 271 P.2d 449, 455 (1954).

senior appropriator. Since he cannot change or transfer his use to the injury of even a junior appropriator and since return flow is a fact of irrigation and of substantial importance to other appropriators, it follows that the senior user will usually not be allowed to transfer or change use to the extent of the water which has been actually spread upon his land, even without waste in the ordinary sense of the word, and his transfer will be reduced by some percentage because of the loss of return flow resulting from the change. As I see it, the effect of such deduction from the amount transferred is to leave the stream in the same condition that it would have been had the change not been effected; instead of receiving that quantity of water through return, a part of the original right is left in the stream to perform the same office for other appropriators as was formerly done by return flow.

Where I part company with the majority is in my disinclination to accept their equation of "beneficial use" with "consumptive use," which permits them to classify as waste any diversion and application of water over and above the amount of water which is actually consumed in crop absorption or evaporation. I would say that applying their definition of "duty of water," as

" * * * that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon. * * * " *Farmers Highline Canal & Reservoir Co. v. City of Golden*, 129 Colo. 575, 272 P.2d 629, 634, reh. den. 272 P.2d 636 (1954),

then the amount which the ordinary and careful irrigator applies to his land represents beneficial use. Neither the definition of duty of water nor of beneficial use requires that the water be applied *without return flow resulting therefrom* ; it does not require that the irrigator shall, by exercise of consummate labor and skill and far exceeding the present standards of irrigation, apply only that amount of water which will be absorbed by whatever plant system is present upon the irrigated tract. I am neither an irrigation engineer nor experienced in irrigation practices, but as I read the cases, texts, monographs and other documents that have come to my attention,[10] it is impossible under the present state of the art to effect such a precise and total use of water in irrigation as to permit us to say that beneficial use and consumptive use are the same thing. It may be true that the practice of flood irrigation is wasteful in the sense that much more water is put upon and passes over the land than can be consumed by the crops thereon, thus exposing the water to evaporation and other loss, but I know of no court or other authority which condemns as wasteful per se the use of water in flood irrigation.[11]

10. For example, see 2d Annual Report of the Territorial Engineer, 1889, in which there is an extensive section on the duty of water. Mr. Mead, the then territorial engineer, referred to duty of water to "mean the area of land upon which a definite volume of water will successfully produce crops." Nowhere in this report do I find any contention that using more water than can be absorbed is a harmful practice which should be prohibited. Bulletin No. 81 of the U. S. Department of Agriculture on the Use of Water in Irrigation in Wyoming, by B. C. Buffum (1900), refers to extensive experiments in irrigation and points out the difficulties in arriving at any fixed measurement of the allowance of water that should be made to the irrigator. These reports are referred to in a comment by Alan W. Peryam, Determining Quanti-

ty in Irrigation Appropriations, 4 Land and Water Law Review 501, 508 (1969).

11. While Kinney, writing in 1912, was of the opinion that irrigation practices could be vastly improved, he also considered that the "final test in all cases is whether *all* of the water diverted is actually applied to some useful or beneficial purpose." 2 Kinney on Irrigation and Water Rights, 2d Ed., § 916, p. 1622. In an earlier section, 912, p. 1614, he makes this further observation:

" * * * But, as can be readily seen, at best, as to what constitutes the actual wasting of water depends upon the facts surrounding each particular case * * *."

It is said in 1 Hutchins, Water Rights Laws in the Nineteen Western States 12 (1971):

I therefore conclude that beneficial use and consumptive use are not the same thing, and that the average appropriator of water for irrigation purposes, limited as his legal appropriation is to the amount which he can and does beneficially use, is not guilty of waste when he applies more water to the land than can be absorbed *without return flow* therefrom. I then conclude that under *Johnston*, so long as other appropriators from the stream are not injured by the transfer, the owner of a pre-1909 water right used for irrigation may dispose of that right in any manner he sees fit, to the full extent that with careful management and use he has reasonably applied water to the land, subject only to the limitation that he cannot injure other appropriators from the stream.

In *Green v. Chaffee Ditch Company,* 150 Colo. 191, 371 P.2d 775 (1962), reh. den., the court was confronted with the attempted transfer of what appeared to be a grossly excessive right, that is, much more water had been granted in the decree than was necessary for the irrigation of the lands in question. The opinion sets forth the very careful findings and conclusions of the trial court: That there was substantial return of water; that the consumptive use was some 25% of the amount applied; that 90 acre feet of water were consumed by the use in the course of an irrigating season; and (this particularly interesting finding):

> " ' * * * That the efficiency of water on this particular land is 25%, *requiring the application to this land of 360 acre feet of water* during each irrigating season to produce maximum crops. That in addition to the 90 acre feet of water consumed on this land, five acre feet are lost by evaporation and seepage while the water is in transit from the headgate of the Coy Ditch to the Hoffman-Morrison farm, making a total consumptive use of 95 acre feet of water each year. * * ' " (Emphasis added)

The court then found that the irrigating season had been from April 15 to October 15 but also that the City of Fort Collins has an average return flow through its sewerage and other systems of 50% of the water taken in its intake pipeline. Finding that only 8 c.f.s. had been beneficially used by the sellers, and that any diversions by petitioners or others in excess of that amount "were a subterfuge and not in good faith," the court then concluded that the city should be allowed to divert 190 acre feet at a rate of not to exceed 8 c.f.s. and only during the irrigation season from April to October.

The real pertinence of this case, to me, lies in the fact that it clearly recognized that in the exercise of good irrigation practice more water had to be taken from the stream and put on the land than could be actually consumed. The use of the term "efficiency of water" in the findings indicates that the Colorado court was convinced that there is no irrigation method that permits application to the land of exactly that quantity of water which will be absorbed by the plant life and therefore the water necessary to be applied, although not consumed, was being beneficially used. Since the water which was not consumed returned to the stream and not to a different drainage, as here, the result was the same as though beneficial and consumptive use are the same, but denial of the change on the basis of injury is a far different concept from that advanced by the majority, namely, that the difference between the water applied and the water consumed represents waste so that the appropriator has no property right therein. The Colorado court's reference to the efficiency of water is consistent with its own definition of the duty of water, accepted by the majority, as the quantity of water which with careful management and use, without wastage, is rea-

"*The strictures [against waste of water] apply essentially to unnecessary waste.*—In the operation of diversion and distribution systems, it is impracticable to save every acre-foot of water. Some so-called waste is inevitable, depending quantitatively on the surrounding circumstances. Because of practical considerations, therefore, the inhibition against waste of water means *unnecessary* waste, which is not tolerated in the State policies relating to beneficial use of water."

sonably required to be *applied* to any given tract.

The board of control has made no determination that more water was being used for the purpose of getting water to the roots of. the plants than was necessary. Without such a finding the board's conclusion that "the waters leaving the irrigated lands as return flow below the Topographic Divide, and entering Long Lake, are not being beneficially, consumptively used for the purposes for which the subject rights were acquired" is without factual foundation and indicates confusion on the part of the board. The question is not whether the return flow to Long Lake represents a beneficial use; the question is whether the water has been beneficially used in the irrigation of lands before commencing its flow into this lake. There is no prohibition in our law against diversion of water to another watershed, *Moyer v. Preston,* 6 Wyo. 308, 321, 44 P. 845, 848 (1896); *Willey v. Decker,* 11 Wyo. 496, 530, 73 P. 210, 220 (1903); *State of Wyoming v. State of Colorado,* 259 U.S. 419, 466, 42 S.Ct. 552, 66 L.Ed. 999 (1922), reh. den. 260 U.S. 1, 43 S.Ct. 2, 66 L.Ed. 1026. The use upon the lands draining into Long Lake was legal; it was beneficial. To me, there is no basis upon which the board could use the two terms in one connection.

I readily concede that in the ordinary case, where the return flow is to the same stream from which the appropriation is made, my distinction between beneficial and consumptive use would not benefit the appropriator seeking to change or transfer his right, since he must leave in the stream that amount of water which represented the return flow. But this limitation is imposed because of injury to other appropriators whose rights have vested and is an inherent limitation upon the water right

vested in the senior appropriator. In the case at bar, without the presence of injury to other appropriators [12] and merely by declaring the two uses to be synonymous, this court effects an arbitrary reduction of the amount of water transferred.

Engineering experts for Basin in this case tried very hard and, I think, effectively, to take into consideration all reasonable limitations upon the extent of the irrigation right. They determined that a considerable portion of the water rights sought to be transferred had not been used at all and no attempt was made to transfer that water. Intensive and less intensive uses were distinguished and a formula for determining the amount of return flow from both these uses was made. Due account was given to the irrigation season. As to those water rights used on land where the return flow was to the Laramie River, a proper deduction was made for that loss of return flow; in other words, that amount of water was left in the stream to prevent injury to other appropriations. But for many years and throughout the history of the water right the water now in dispute has been removed from the Laramie River drainage so that historically and before the rights of other appropriators had attached, all of the appropriation had been lost to the Laramie and its appropriators. Basin made no deduction for return flow as to this water because it was not necessary to prevent injury. The board's denial of this transfer clearly gives a windfall to users on the Laramie and at the same time effects a substantial diminution of the transferrable water right. Such diminution can only operate to reduce the value of the right so that in my judgment the refusal to permit the change represents a material interference with the property right as defined in

12. With reference to this particular use, the board found that

"* * * return flow from said lands entered Long Lake which constitutes a closed basin, and none of the flows return to the Laramie River."

Notwithstanding this finding, the board made the further finding (I would call it a conclusion) that

"* * * return flows are not consumptively used below the divide and that such return flows are credited to the Laramie River system as hereinafter set forth in the Order." The plain effect of this is that junior appropriators on the Laramie have available to them a certain quantity of water that was never available before.

*Johnston.* This interference cannot be justified on the basis of some overriding state or public interest as original owner of the water or in the exercise of any police power, and upon the facts of this case it is improper and unjustified deprivation of interference with property which therefore is prohibited by both the federal and state constitutions.

Declarations that a statute is unconstitutional as applied to a particular situation are recognized by the jurisprudence of this state. In *Addison v. Fleenor,* 65 Wyo. 119, 196 P.2d 991, 993 (1948) this court held a so-called curative act constitutionally invalid in its application to one type of notice in probate matters while holding it valid as to other types of notice therein considered. It was said:

" * * * However, a statute may be constitutional in part and unconstitutional in part. It is said in *Alberts v. Town of Danforth,* 281 Ill. 521, 118 N.E. 33, that a law which is enacted in such general terms as to apply to all conditions of fact, both those prohibited by the constitution and those concerning which the legislature has the power to legislate, will be held valid to the extent of the legislative power. In *State ex rel. v. Ross,* 31 Wyo. 500, 512, 228 P. 636, 639, this court stated: " 'A statute clearly unconstitutional as to certain persons or things, but constitutional as to others, may be sustained as to the persons or things to which it may be applied without conflict with the Constitution, if it be believed that the Legislature would have enacted the statute with the unconstitutional parts eliminated.'

"And see the review of our cases and those of other states in the case of *Hanson v. Town of Greybull* [63 Wyo. 467] 183 P.2d 393. In view of the fact that the legislature of this state undertook to legislate as to all notices in probate proceedings, there is no reason to think that it would not have validated proceedings in so far as they are non-jurisdictional."

This was in effect what the federal district court for the district of Wyoming did in *Hughes v. Lincoln Land Co.,* 27 F.Supp. 972, 973–974 (1939). The land company had without previous authority from the board of control or otherwise commenced using water on a different section of land from that for which it had been acquired. The right had its inception prior to 1909 and in sustaining the appropriator's right to make this change, Judge Kennedy said:

" * * * [C]onsidering the fact that in *Johnston v. Little Horse Creek Irrigating Co.,* supra, it is held that the right to the use of water based upon a prior appropriation for beneficial purposes is a property right, it would seem that no statute which the State might subsequently pass could abridge that property right or reduce its value without intrenching upon the constitutional right of the owner."

The statement of the Supreme Court of Nebraska in *Enterprise Irr. Dist. v. Willis,* 135 Neb. 827, 284 N.W. 326, 330 (1939) is pertinent:

" * * * While vested water rights may be interfered with within reasonable limits under the police power of the state to secure a proper regulation and supervision of them for the public good, any interference that limits the quantity of water or changes the date of its priority to the material injury of its holder is more than regulation and supervision and extends into the field generally referred to as a deprivation of a vested right."

I would therefore hold that the consumptive-use restriction cannot be applied to the transfer of water rights which had their inception prior to enactment of Ch. 68, S.L. of Wyoming 1909. I do this only within the narrow confines of this case and with full realization that in most instances where a change is sought, disposition of the question of injury to other appropriators will require limitation of the transfer to the amount which has been consumptively used. But in the absence of a showing of injury through deprivation of water to which junior appropriators have become entitled, I do not believe that the clause in question can properly be applied to old rights.